## COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

**In Re: Dracut Public Schools**                                    **BSEA # 08-5330**

### DECISION

This decision is issued pursuant to the Individuals with Disabilities Education Act (20 USC 1400 *et seq*.), Section 504 of the Rehabilitation Act of 1973 (29 USC 794), the state special education law (MGL c. 71B), the state Administrative Procedure Act (MGL c. 30A), and the regulations promulgated under these statutes.

A hearing was held on December 11, 2008, January 22, 2009, and February 2, 2009 in Malden, MA before William Crane, Hearing Officer. Those present for all or part of the proceedings were:

| | |
|---|---|
| Student | |
| Student's Mother | |
| Student's Father | |
| Karen Levine | Private Psychologist |
| Mary Elsa Abele | Consultant in Pragmatic Language |
| Debra Hart | Director of Education and Transition Team, Institute for Community Inclusion |
| Michele Mayer | Vice President of Children's and Transitional Services, HMEA |
| Jewell Davis[1] | Professor, Middlesex Community College |
| Dena Sterling | Educational Advocate |
| Ann Nicholson | Special Education Teacher, Dracut Public Schools |
| Sarah Price Rosen | Science Teacher, Dracut Public Schools |
| Rachel Cotter | Former Autism/Inclusion Specialist, Dracut Public Schools |
| Paul Berard | Teacher and Track Coach, Dracut Public Schools |
| Steven Caristinos | Technology Coordinator, Dracut Public Schools |
| Julie Mazzola | Guidance Counselor, Dracut Public Schools |
| Martha McLarney | School Adjustment Counselor, Dracut Public Schools |
| James Generoso | Principal, Dracut Public Schools |
| Brad Brooks | Program Manager, Merrimack Special Education Collaborative |
| Steven Stone | Executive Director of Special Education, Dracut Public Schools |
| Janine Solomon | Attorney for Student |
| Pamela Coveney | Attorney for Student |
| Richard Glassman | Attorney for Student |
| Kevin Murphy | Attorney for Dracut Public Schools |
| Lindsey Cyr | Court Reporter |
| Maureen Pires | Court Reporter |
| Barbara Milne | Court Reporter |

---

[1] Ms. Davis testified by telephone.

The official record of the hearing consists of documents submitted by the Parents (hereinafter, "Parent" refers to Student's mother,[2] and "Parents" refers to Student's mother and father) and marked as exhibits P-1 through P-45; documents submitted by the Dracut Public Schools (hereinafter, "Dracut") and marked as exhibits S-1 through S-30; and approximately two and one-half days of recorded oral testimony and argument.

## I. INTRODUCTION

This dispute considers the appropriateness of the transition services that Student received during his last two years of high school and whether compensatory transition services are due.

In Dracut's view, Student, who is diagnosed with Asperger's Syndrome, made significant educational progress over the course of his four years at Dracut High School (hereinafter, "High School"). Student has satisfied Dracut's graduation standards. It is not disputed that Student did well academically, he successfully participated in two vocational internships and a mentor program, he established friendships at school, and he was observed to interact in an appropriate manner with his peers at lunch and during other unstructured times. The Dracut teachers and staff viewed Student as ready for his postsecondary goal, which was to attend college and eventually work in the area of computers.

In Student's and Parents' view, Dracut's special education and related services did not address Student's deficits (related to, for example, his pragmatic language skills, social skills, organizational, vocational skills, and travel skills), with the result that he is ill-equipped to participate successfully in postsecondary education, employment, and independent community living. Student and Parents take the position that what Student learned within the High School environment did not provide Student with skills needed to succeed after High School and that, as a result, Dracut has an obligation under state and federal special education laws to continue Student's eligibility for the purpose of providing prospective transition planning and services to Student; and, in addition, Dracut owes Student compensatory transition services.

For reasons explained below, I have concluded that Dracut owes Student two years of compensatory services.

## II. PROCEDURAL HISTORY

On May 29, 2008, Student (through his attorneys) filed his *Hearing Request* with the BSEA, seeking a finding that Dracut had failed to provide appropriate transition services, that Dracut must continue to provide transition services to Student beyond the date of his graduation (June 2008), and that Dracut must also provide compensatory transition services. Dracut filed a response, taking the position that Student had received appropriate transition services and that all special education and related services (including transition services) should end on his expected graduation from High School in June 2008.

---

[2] Student has designated educational decision-making authority to his parents.

Student then filed a motion seeking an emergency stay put order would allow Student to participate in the graduation ceremonies without accepting or receiving his High School diploma. In a ruling dated June 6, 2008, the previous BSEA Hearing Officer allowed the motion, concluding that Student may participate in the graduation exercises, may refuse the proffered diploma, and will retain his substantive and procedural rights to a free appropriate public education until resolution of the merits of the dispute. The previous Hearing Officer further found that Student's stay-put placement was the last-agreed-upon set of special education services at Dracut High School, as memorialized in Student's current IEP.

Hearing dates were scheduled for August 25, 26, and 27, 2008. The parties subsequently filed a joint motion to postpone the hearing in order to allow for further evaluation by HMEA (formerly, known as Horace Mann Educational Associates). This motion was allowed, and new hearing dates scheduled for December 9, 11, and 12, 2008. The December 9, 2008 hearing day was cancelled by the BSEA, this matter was re-assigned to the present Hearing Officer on December 11, 2008 which was the first day of hearing, and the December 12, 2008 hearing day was cancelled because of inclement weather. Additional hearing days were scheduled, with the final hearing day occurring on February 2, 2009.

As agreed by the parties, written closing arguments were due on March 2, 2009, and the record closed on that date.

## III. ISSUES

The issues to be decided in this case are the following:

1. Whether Student continued to be eligible after June 2008 to receive transition planning and services pursuant to an IEP; and if so, what transition planning and services should be provided.

2. Whether Dracut has provided appropriate transition planning and services since 2006; and if not, whether Student is entitled to compensatory services; and if so, what compensatory services should be provided.

## IV. FACTS

**Profile.** Student is a bright, articulate, thoughtful, delightful, charismatic, and engaging nineteen-year-old young man who lives with his Parents in Dracut, MA. Student's principal diagnosis is Asperger's Syndrome. Student has also been diagnosed with Attention Deficit Hyperactivity Disorder and an anxiety disorder. Student has a significant pragmatic language deficit that negatively impacts his ability to understand non-verbal communication, to participate in reciprocal communication, and to socialize with others. He also has a significant organizational weakness that impacts his ability to perform personal hygiene functions (such as showering and brushing his teeth) on a regular basis and understand basic texts (such as the Massachusetts driver's manual). Testimony of Mother, Levine, Abele, Mayer; exhibits P-3, P-36, P-43.

3

Student does not have any friends with whom he socializes. He generally does not leave his Parents' house except to attend classes twice weekly at Middlesex Community College (to which he commutes independently by public bus) and to go to New Hampshire with his family where they camp in their trailer. Student enjoys playing video games and computer games. He also enjoys watching sports, the history channel, and the military channel on TV. Student completed four years of High School, he declined Dracut's offered diploma, and he is no longer receiving any educational services from Dracut. Testimony of Student, Mother; exhibit P-43 (page 3).

For purposes of transition planning, Student prepared annual vision statements in 2007 and 2008, which reflected the following interests and goals: attend college, work in the computer field, and learn independent living skills, including obtaining his driver's license and improving his self-advocacy skills, communication skills, and social skills. Student testified that, "as an adult," he wants to be a computer repairman, and he wants to be "rich" and "successful." He further explained that he would like to live independently with friends ("if he had any") in Arizona. Testimony of Student. Exhibits P-18, P-20.

**IEPs.** Student and Parents filed their *Hearing Request* with the BSEA on May 29, 2008 and are therefore allowed, pursuant to the IDEA's statute of limitations, to "look back" two years—that is, until May 29, 2006—for purposes of challenging the transition planning and services that have been provided by Dracut. For these purposes, there are three relevant IEPs. Each IEP included a transition plan. Exhibits P-16, P-19, P-21, S-12, S-15, S-19, S-24, S-25.

The IEP for the period 5/8/06 to 5/7/07 (which began near the end of Student's 10th grade and ended near the end of 11th grade) included the following direct services outside of the general education classroom: counseling by the school adjustment counselor for 30 minutes, once per week; and a social group by special education staff for 25 minutes, once per week. The IEP also included consultation services by the autism/inclusion specialist for 30 minutes, once per week; and consultation from the "counselor" for 15 minutes, once per week. Exhibits P-21, S-24, S-25.

The transition plan for this IEP described the following "action plans" under the respective headings:

> Course of Study: plan notes that Student is enrolled in college preparatory courses at the High School and notes Student's special education and related services.
> Employment: plan explains that assistance has been offered to develop a letter to future employers regarding his disability and needed accommodations.
> Community Experiences: plan states that school personnel have discussed other sports-related activities in which Student could participate.
> Daily Living Skills and Needs: plan notes that Student is independent in the school environment, is currently taking an accounting course, and a chapter 688 referral will be made next year.

Exhibits P-21, S-24, S-25.

The IEP for the period 2/6/07 to 2/5/08 (which began near the middle of Student's 11th grade and ended near the middle of 12th grade) included the following direct services outside of the general education classroom: counseling by the school adjustment counselor for 30 minutes, once per week; and social/emotional services by a special education teacher for ten minutes, ten times as needed [sic]. The IEP also included consultation services by the autism/inclusion specialist for 30 minutes, once per week. The transition plan for this IEP is substantially the same as the transition plan included in the previous IEP, which is exhibit P-21. Exhibits P-19, S-15.

The IEP for the period 2/6/08 to 6/10/08 (which began near the middle of Student's 12th grade and ended at the completion of 12th grade) included the following direct services outside of the general education classroom: counseling by the school adjustment counselor for 30 minutes, once per week; and social/emotional services by a special education teacher for five minutes, ten times as needed [sic]. The IEP also included consultation services by the autism/inclusion specialist for 30 minutes, once per week. Exhibits P-16, S-12.

The transition plan for this IEP utilized a different format than the transition plans included in the previous two IEPs. The action plan for this transition plan stated the following: daily check-in for organizational skills during the school day, availability of special education and guidance staff, participation on track team, participation in wellness internship during gym class, participation in banking course (where Student will expand his social skills by interacting with co-workers and customers) and several higher-level computer courses, participation in computer internship, completion of courses regarding money management, referral to Massachusetts Rehabilitation Commission, recommendation that Student pursue part-time employment or volunteer position to receive exposure to employment experiences and opportunities, and Team's discussion of recreational opportunities in the community. Exhibits P-16, S-19.

**Educational History.** Student entered the Dracut High School as a freshman in the fall of 2004. During his freshman and sophomore years, Student had difficulties at school, both within the classroom and socially with his peers. Student was in an unfamiliar environment. He was reactive and defensive, he seemed tense when he interacted with other students, and he generally kept to himself. Student's problems were as noted by Dr. Levine in her testimony and were similar to those reported in the more recent letters from Middlesex Community College administrators (exhibits P-44, P-45). During sophomore year, Student had a few altercations with other students. Testimony of Cotter, McLarney, Mother.

In January 2005 during Student's freshman year, Mother had her son privately evaluated by Mary Elisa Abele, a speech-language pathologist. for purposes of considering Student's deficits in pragmatic language. Ms. Abele's report (discussed separately below) found significant language deficits and recommended services. The report was considered by Dracut, but it did not result in any change of services. Without receiving any assistance from Dracut to address what Mother believed to be important social and language deficits, Mother placed her son privately into the Spotlight Program, attending three hours every other week after school for two years during 2005 and 2006. Testimony of Mother, Abele.

In January 2006 during Student's sophomore year, he was suspended for six weeks for bringing a letter opener to school. This incident prompted Mother to seek an evaluation of her son, which was done by Karen Levine, a psychologist, and which is described separately below. As a result of this evaluation, Student was determined eligible to receive special education and related services. Also, Student's behavior (of bringing a letter opener to school) was determined to be a manifestation of his disability. Student had not previously been eligible to receive special education and related services during High School, although he was on an accommodation plan pursuant to Section 504 of the Rehabilitation Act. Testimony of Mother, Levine.

Dracut staff believed that through the IEP Team process, Dracut considered Student's social needs, pragmatic language deficits, and behavior both in and outside of school. To address these concerns, Dracut staff consulted with the Dracut autism specialist (Ms. Cotter) and through the IEP Team process, offered counseling twice each week and a social group. These were rejected by Parents. Testimony of McLarney.

Mother testified that she rejected counseling services on the IEP because counseling would have been during the same time period as math, which her son needed to attend, and because she wanted someone counseling her son who was trained in working with students with Asperger's Syndrome.

Dracut staff testified that at that time (late winter and early spring of 2006), Student's classroom aberrant behavior consisted of his making an excessive amount of comments during class time. During Student's sophomore year, Ms. Cotter (Dracut's autism/inclusion specialist) spoke with Student regarding this classroom behavior. Within two or three weeks, his off-topic comments during class had decreased. Dracut staff also worked with Student on slowing down and calming down, and staff re-framed issues for him. Testimony of Cotter, McLarney, Nicholson; exhibit S-2.

During an IEP Team meeting during sophomore year, Ms. McLarney suggested that Student obtain an after-school job, but this was not possible because the family went away on weekends. Testimony of McLarney.

In November 2006 of Student's junior year, Mother brought a behavior specialist (Linda Price) to an IEP Team meeting. Ms. Price recommended that Student be provided a social skills program. The Dracut members of the IEP Team declined to add this service to Student's IEP. Testimony of Mother.

In May 2007 of Student's junior year, Ms. Abele, at Mother's request, conducted a follow-up observation and evaluation of Student's pragmatic language deficits. Her report (discussed separately below) found that Student's deficits remained unaddressed. Ms. Abele's report recommended that services be put into place to address these deficits. Her report was presented to the IEP Team at a meeting which was scheduled for a time/date when Ms. Abele could not attend. The IEP Team declined to follow any of Ms. Abele's recommendations. Dracut's former autism specialist (Ms. Cotter) testified that Dracut never proposed to provide Student with the discrete training in language pragmatics recommended by Ms. Abele because, in Ms. Cotter's opinion, Student was observed to be successful in school with the

result that Ms. Abele's proposed services were not needed.  Testimony of Mother, Abele, Cotter.

Dracut staff testified that by his junior and senior years, Student's social skills had improved, and he had the ability to modify his behavior so that it was appropriate at the High School. In the hallways and at other unstructured times, Student was observed as appropriately interacting with his peers.  For example, Student appeared to be relaxed in his interactions with other students; other students were observed to interact with him in the same way that they would interact with any other student; and during lunch time, Student did not eat alone, and he engaged in appropriate conversations with others.  Testimony of Cotter, McLarney, Nicholson, Mazzola, Generoso.

During this time (January 2008, during Student's senior year), Student had one behavioral incident, which involved a physical altercation with another student .  Student was suspended.  Testimony of Mother.

Dracut witnesses testified that Student's teachers believed that he had fewer needs over time as he matured over the course of his four years at the Dracut High School.  By the second half of his senior year, Student's teachers generally believed that he was performing well academically, and he required little re-direction.  They believed that, in general, any difficult issues regarding Student could be addressed through a quick discussion between Student and one of his teachers.  Student's teachers and staff concluded that his conduct and behavior did not indicate that he needed assistance with development of social skills, and Dracut staff found that there was no need for specialized training of his teachers regarding Student's disabilities and how to work with him.  Testimony of Cotter, McLarney, Nicholson, Mazzola, Generoso, Stone.

In her testimony, Mother disagreed.  She believed that her son required the development of greater social, vocational and transportation skills, and that her son's language pragmatics deficits needed to be addressed.  She sought unsuccessfully to have added services in these areas within her son's IEP.  In March 2007 during his junior year, Student began (through Mother's initiative and funding) a private program in the community to address social skills and language pragmatics.  Testimony of Mother.

Student was an enthusiastic participant (as a shot-putter) in winter track during his junior and senior years, and he got along well with everyone on the track team, particularly the other shot-putters and the track coach (there was an isolated incident of harassment by another student, but this was resolved by the track coach).  Through his participation in track, Student created his own social group at school, he ate lunch with friends from the track team, and in general at school he was observed to be doing well socially.  Testimony of Cotter, McLarney, Nicholson, Mazzola, Berard, Generoso.

Student's track teammates awarded Student the "Team Spirit" award at the end of his junior year; he received the Fran Kelley award (given to a student whose participation in track has helped overcome obstacles) in his senior year; and he received three scholarship awards (of $1500, $500, and $500) in 2008.  When Student received the scholarship awards during the High School's Pride Night, the audience expressed its enthusiastic appreciation although

Student was observed to encourage this response from the audience. Testimony of Berard, Generoso, Mother; exhibits S-3 (3rd page), S-30 (DVD of Pride Night).

Student's friendships did not carry over to after school. Only once or twice during his High School years did Student spend time with school friends outside of school—for example, when he was invited to a party. As a result, Student did not generally socialize with his peers outside of the High School. Testimony of Mother, Student.

During his senior year, Student took a college-preparatory level science course at Dracut High School. The course utilized a pre-college text. Student's science teacher (Ms. Rosen) testified that Student was engaged and on task (except occasionally when he would be off-task and was easily re-directed), he completed his assignments on time, and he was an "outstanding" student, obtaining a final grade of A+. Ms. Rosen also testified that Student's classroom participation was never out of control (in contrast to what was reported by Ms. Davis in her testimony regarding Student's participation in a Middlesex Community College course, as discussed separately below), and Student functioned in her classroom at a very high level. During High School, Student took other college-preparatory courses, in which he did well academically. Testimony of Rosen, Cotter.

During his senior year in High School, Student participated in a gym mentoring program four times per week during one semester. Through this program, Student was responsible for leading stretching exercises, organizing equipment, explaining the rules, and acting as a referee. This occurred during unstructured parts of a gym class for freshmen. Student was successful in this mentoring program. Testimony of Cotter, Student.

During his senior year from late January until late May 2008, Student participated in a private credit union which served the general public and which was located within the Dracut High School. Student participated in this internship for 50 minutes, three times per week; and during those weeks when he was not in the technology internship (described below), he participated an additional 90 minutes, once per week. He was trained (and was successful) in making deposits and withdrawals for bank customers. He worked well with others, including members of the public who utilized the bank. Testimony of Cotter, Stone, Student.

During the second semester of senior year (starting after February vacation and continuing until late May 2008), Student participated in a technology internship for 90 minutes, once per week. The internship consisted of Student's meeting with the Dracut technology coordinator (or the coordinator's assistant). and assessing, troubleshooting, and repairing computers by replacing or installing software and hardware. Student followed directions, was always polite, and demonstrated excellent behavior while interacting with adults. Testimony of Caristinos, Stone, Student.

Student attended the Learning Center for ten minutes, twice per week where Student received assistance with organization skills. Student required assistance understanding what he needed to do for homework and with his goal of attending college. He demonstrated improvements regarding his organizational skills. Testimony of Nicholson.

Student consistently indicated to Dracut staff (for example, during IEP Team meetings) that his primary focus regarding transition planning was to attend college and work with computers. Testimony of Cotter, Nicholson, Mazzola.

During Student's senior year, Ms. Mazzola (Dracut guidance counselor) discussed with Student his options for attending college, as well as the process of writing a resume and an essay for the college application. Ms. Mazzola gave to Mother the application for Student to attend Middlesex Community College, which was the only college that Student considered. In Ms. Mazzola's opinion, Student was prepared to attend college, based upon his SAT scores, extracurricular activities, and behavior in school. Testimony of Mazzola.

For purposes of assisting Student's transition from High School, Dracut staff spoke with staff from the Massachusetts Rehabilitation Commission to learn what services would be available to Student after graduation. Dracut staff learned that job training and tuition reimbursement might be available to Student. Dracut staff also spoke with staff from Merrimack Educational Collaborative regarding Student. Testimony of Nicholson.

Dracut's school adjustment counselor (Ms. McLarney) testified that by June 2008, Student was prepared to leave Dracut High School and attend college, although she conceded that she only knew Student with respect to what she has observed within school and knew nothing about Student's experiences outside of the school environment. Testimony of McLarney.

Student's senior year science teacher (Ms. Rosen) testified that, in her opinion, Student was ready for college, based upon his performance in her class. She noted that because Student was appropriately engaged in High School, he would likely be appropriately engaged in college. She further stated that she is an adjunct faculty member at Middlesex Community College, and in her opinion, Student was prepared to attend this college. Testimony of Rosen.

Student's teachers generally believed that by the end of senior year, he was ready to take the next step, which for Student was to attend college. Testimony of Cotter, McLarney, Nicholson, Mazzola, Generoso, Stone.

Student's special education teacher (Ms. Nicholson) testified that, in her opinion, through the computer internship, bank internship, and mentoring program at the gym, Student was given the opportunity to pursue his vision of what he wanted to do after high school. Testimony of Nicholson.

The Dracut director of special education (Mr. Stone) testified that, in his opinion, Dracut provided appropriate transition services during the last two and one-half years of high school. These services provided Student with employment experiences (through internships at the credit union and technology services) and were sufficient to prepare Student to attend college, which was his goal. Testimony of Stone.

In June 2008, Student had completed his senior year at Dracut High School, and Dracut offered Student a high school diploma. Student participated in the Dracut High School graduation, but he declined to receive a diploma. Testimony of Mother.

Since June 2008, Student has not received further educational services from Dracut. He has continued his education at the Middlesex Community College where he took a remedial math class and an English composition class during the first semester of the 2008-2009 school year. Student's English composition professor, Ms. Jewell Davis, testified that Student was one of 18 or 19 students in her first semester class. Ms. Davis explained that she found Student to be likeable and intelligent, Student attended every class, and he passed her course. Ms. Davis stated that her class was conducted entirely on the basis of classroom discussion without lectures. Ms. Davis testified, however, that Student was completely unsuccessful in following the classroom protocol regarding classroom discussion (details of Ms. Davis' testimony are provided below in section V.B. of this Decision). Testimony of Mother, Davis.

The former Dracut autism specialist (Ms. Cotter) testified (after hearing Ms. Davis' testimony) that she was not surprised to hear Ms. Davis' testimony of Student's difficulties with a class that utilized entirely a discussion format where Ms. Davis had not made clear at the outset of the course her expectations regarding classroom participation. Testimony of Cotter.

Mother and Student testified regarding Student's life since the ending of High School in June 2008. Mother stated that Student does not leave the house by himself except to go to his classes at Middlesex Community College twice each week. He does not have friends. He does not have visitors at home. He does not talk to anyone on the phone. A typical day for Student is to get up late, he spends time on the computer, researching prices to buy computer parts and repairing computers, and he stays up late. He bathes or showers only twice a week (before going to his college classes two days per week), and he is not brushing his teeth. Testimony of Mother, Student; exhibit P-43 (page 3).

In September 2008, Student had to learn how to take the bus to get to college since he did not have his driver's license. Mother was able to teach her son how to take the bus to college, but he has not been able to learn any other bus routes. Testimony of Mother

Student has not been able to obtain a driver's license because he is unable to understand the driver's manual. Student finds it too difficult to use the manual because it is not broken down into manageable chunks of information, with the result that the manual overwhelms him. Testimony of Student, Mayer.

Student has attempted to fill out (but has been unable to complete) job application forms as he typically becomes stuck on the military service portion of the application even though Student has not been in the military. Testimony of Mother.

**Evaluation and Testimony by Dr. Levine.** On February 1, 2006, at the request of Parents, Karen Levine, PhD, saw Student for a diagnostic psychology consultation and prepared a written report entitled "Psychology Note." Testimony of Levine; exhibit P-3.

Prior to this consultation, Dr. Levine had indirect familiarity with Student since Dr. Levine provided consultation to the Spotlight Program that Student attended. Dr. Levine co-signed a

Spotlight progress report for Student, which indicated that the primary goals addressed by Spotlight were Student's deficits regarding social pragmatics, and more specifically, his difficulties with (1) social referencing (i.e., non-verbally observing what someone is talking about), (2) timing in conversation, (3) turn-taking, (4) social appropriateness, and (5) tone of voice modulations. Dr. Levine testified that social pragmatics, in general, and the more specific difficulties listed in the progress report, above, are common issues for someone with Student's disabilities. Testimony of Levine; exhibit P-4 (2ⁿᵈ page).

Dr. Levine testified, and her report reflects, that Student was a delightful, charismatic, young man who presented with difficulties typical of a student with Asperger's Syndrome. More specifically, she explained that (1) Student's timing of conversation was off and he did not check in with the listener; (2) his voice volume and body orientation were inappropriate to the situation; and (3) he had difficulty with topic maintenance and reverted to his own topic. She also noted Student's pressured speech and manic style that are common for students with Asperger's Syndrome. Testimony of Levine; exhibit P-3.

Dr. Levine testified that Student's own conversation topics were of particular concern, as Student spoke of religious disciples who would come to his bedroom at night, he saw and talked to them, and he was adamant that they were real even though others could not see or hear them. Dr. Levine concluded that although Student was not likely psychotic, he needed a more intensive, therapeutic program that could address the mental health underpinnings of his behavior. Testimony of Levine; exhibit P-3.

Dr. Levine testified that she has not seen Student since her evaluation of him in February 2006. However, she noted that she had reviewed other reports and records pertaining to Student, including Elsa Abele's observations and evaluations of January 10, 2005 and May 1, 2007 (exhibits P-7, P-8), Michelle Mayer's assessment of Student in October 2008 (exhibit P-43), and letters dated October 3, 2008 reflecting behavioral concerns at Middlesex Community College (exhibits P-44, P-45), and Student's more recent IEPs. Testimony of Levine; exhibit P-3.

Dr. Levine testified that the more recent reports and records regarding Student reflect content and description of Student similar to that contained in her report of February 2006. On the basis of her own evaluation and the review of more recent reports and records, Dr. Levine testified that Student needs continuing support regarding social situations as he moves from the High School environment to less protected environments in the community. She explained that in any environment where there are variables new to him, Student has to re-learn how to act and respond. She noted that Student can be taught to adapt to new situations, and he can be successful within a new environment when it becomes familiar to him and he learns what is expected of him, but he requires support to make this transition since he is not capable of intuitively generalizing what he has learned previously.

In her testimony, Dr. Levine also expressed concern regarding Student's impulsivity, with the result that when there are misunderstandings and without sufficient support, there may be altercations (Dr. Levine noted that the October 3, 2008 letters in exhibits P-44, P-45 may be examples of this). Dr. Levine also testified that given Student's mental health deficits, the above issues will likely be magnified under stress. Dr. Levine concluded that without

11

appropriate supports, Student will unlikely be successful generalizing to new environments what he has previously learned, and he would be at risk of social isolation and depression. Testimony of Levine; exhibit P-3.

**Observation, Evaluation, and Testimony by Ms. Abele.** In January 2005 and May 2007, Mary Elsa Abele, MS, CCC, at Parent's request, conducted functional language pragmatics observations and evaluations, and she prepared a written report in each instance. Testimony of Abele; exhibits P-7, P-8.

Ms. Abele found that both in January 2005 and in May 2007, Student had the same three basic pragmatic language deficits: (1) failure to understand the conversational hierarchy and listening hierarchy necessary to have a schema of the skills of talking with a conversational partner; (2) inability to organize and relate personal event narratives by telling mini-monologues within a conversation, which are used to make a connection with a conversational partner; and (3) lack of "self-talk" skills --that is the ability to evaluate and reflect upon, and then edit and filter one's own thoughts before acting or speaking.

Ms. Abele observed that in the classroom in both January 2005 and May 2007, Student's pragmatic language deficits resulted in his asking questions and making comments that were inappropriate within a group or community context and would be appropriate only if he were the only student in the classroom—that is, a 1:1 tutorial. For example, in May 2007, he unexpectedly interjected a personal announcement during class that "third period I have long weight lifting and last period long story" and then immediately gave a correct answer to a question regarding continuously compounding interest. Ms. Abele testified that she observed that Student still did not understand the rules and expectations of discussions in a classroom. Similarly, in January 2005, Student was observed in Spanish class raising his hand (to be called on) and answering a question at the same time, and at times, calling out information unrelated to the group discussion. Ms. Abele testified that Student lacked the skills necessary to be included in classroom discussion in a meaningful manner and to connect with others in a reciprocal manner. During both classroom observations (in 2005 and 2007), the teacher and other students interacted with Student in the same ways, and Student demonstrated no improvement (from January 2005 to May 2007) in his pragmatic language skills. During both evaluations (January 2005 and May 2007), Ms. Abele interviewed Student and found similar pragmatic weaknesses during the course of the interview.

Ms. Abele testified that Student's strength is to talk about subjects that interest him and to drive the content of the discussion. This allows Student to enjoy (and be successful when) talking to adults who hold the conversation together, help Student to organize his thinking, and take responsibility for "making the conversation work", without expecting a reciprocity of conversation. Student can be articulate in verbalizing his own thoughts within this context.

With respect to his pragmatic language weaknesses, Ms. Abele testified that Student tends to say too much on subjects of interest to him and is not skilled at taking into consideration the interests, perspective, and needs of the other person in the conversation. Thus, he has limited skills relative to the reciprocity of conversation. Similarly, Student is generally unaware of what language is or is not appropriate within a specific context and therefore does not have

the ability to adjust his language accordingly—for example, he was not able to distinguish between what would be appropriate speech within a 1:1 conversation as compared to what would be appropriate speech within a classroom context during the classroom observations in 2005 and 2007. Similarly, Ms. Abele testified that Student is generally unaware of non-verbal communication of others, and therefore is not able to receive and make use of this information, and this is a necessary part of effective communication since so much of what is communicated is done non-verbally. Student also does not have the ability to monitor his own participation in conversation and to make adjustments to conform to the expectations of those with whom he is speaking.

Ms. Abele testified that Student's Asperger's Disability is a neurological disorder that will not disappear or change. Ms. Abele concluded after her record review that without having received the specific instruction necessary to ameliorate his weaknesses, Student would necessarily continue to have these same pragmatic language deficits today as he demonstrated in January 2005 and again in May 2007.

Ms. Abele testified as to the future implications to Student of having these continuing deficits. She explained that although the development of appropriate language pragmatics skills is only one part of a student's education, the implications of deficits in this area are pervasive in that they are likely to jeopardize Student's success in higher education, employment, and living independently. Ms. Abele noted that in whatever context Student participates after High School, in order to be successful he has to communicate in a manner that is in conformity with the general expectations within that particular context and that does not break the written or unwritten rules of behavior, and he has to be able to receive information from others through verbal and non-verbal communication.

Ms. Abele testified that without development of pragmatic language skills (that Student currently does not have), he does not have sufficient communication skills to obtain the information that he needs and to apply his intelligence and skills. As a practical matter, for example, Student has the skills and knowledge to obtain employment but does not have the communication skills to be successful at work and hold a job. Similarly, the letters from Middlesex Community College (exhibits P-44, P-45) illustrate how Student must learn to conform his communication to the expectations of this educational context if he is to continue at the College. Ms. Able concluded by noting that if Student does not develop appropriate and adequate pragmatic language skills, he is likely to go in and out of higher education and in and out of jobs, with the result that he as at risk of becoming discouraged, staying at home, and failing to realize his potential to live independently.

Ms. Abele testified that Student is intelligent and motivated to learn, and he has a relatively strong understanding of content language (for example, vocabulary). Ms. Abele explained that notwithstanding these strengths, Student (as one would expect of other persons with his disability) does not have the innate ability to learn from context or the environment what language to use. As a result, he also does not have the ability to model his language from others by observing and copying what language they are utilizing.

Ms. Abele testified that in order to address his pragmatic language deficits, it is necessary that Student be provided a specific curriculum that is taught to him on a step-by-step basis.

13

The curriculum must explicitly teach Student how to interact with and communicate with others. The curriculum must specifically address each of Student's three basic deficit areas (referenced above). Those teaching Student language pragmatics must have an understanding of how language works and must have the skills to explicitly address Student's pragmatic language deficits.

Ms. Abele testified that Student (as others with Asperger's Syndrome) is likely to quickly understand the concepts of language pragmatics, but it is much more difficult for him to apply these concepts. Accordingly, pragmatic language instruction must be done systematically on a step-by-step basis, with a significant amount of practice with a language pragmatics teacher and at least one peer. Practice needs to occur within a variety of contexts, including higher education and employment, in which Student will be actually functioning after High School. In order to make meaningful gains in language pragmatics, these skills need to be taught with consistency and need to be taught over a period of time. This is necessary so that Student will be able to actually make use of his pragmatic language skills within the important contexts of his life (which are higher education, employment, and independent community living).

Ms. Abele testified that, as a practical matter, a pragmatic language group can be utilized initially to teach the skills. This can occur typically by meeting for approximately one and one-half hours, once per week, for a period of one and one-half to two years. The group is utilized to work on specific skills. She explained that, in addition, a personal coach should be utilized to accompany Student into the actual environments (for example, job site, library, and higher education classroom ) where Student will be utilizing verbal language. Typically, the job coach would be with Student once each day in different environments over the course of an entire school year, with continuation (but spending less time with Student) in a subsequent year.

Ms. Abele testified that subsequent to her January 2005 observation and evaluation, she presented her findings and recommendations to an IEP Team meeting. Ms. Abele further testified that none of her recommendations was adopted by the Team and none of Student's services was changed as a result of Ms. Abele's evaluation since, apparently, the Dracut Team members believed that Ms. Abele's areas of concern were already being addressed appropriately. Testimony of Abele.

Ms. Abele testified that subsequent to her May 2007 observation and evaluation, the IEP Team met to consider her report but did so at a time that was not convenient for Ms. Abele, with the result that she was unable to attend the meeting. She testified that none of the Dracut members of the IEP Team followed up with her, and Student's services were not changed as a result of her findings and recommendations.

Ms. Abele testified that Dracut could have addressed Student's pragmatic language deficits following her January 2005 observation and report, and again had the opportunity to address these deficits following her May 2007 observation and report. She explained that with appropriate instruction, Student would likely have made effective progress regarding language pragmatics.

14

**Testimony and assessment by Ms. Mayer.** In October 2008, Michele Mayer (Education Specialist and Board Certified Behavioral Analyst) conducted, at Parents' request, a readiness-to-graduate assessment of Student. Testimony of Mayer.

Ms. Mayer's assessment of Student included a record review, direct observation and testing of Student, and interviews of Student, Mother, and four Dracut staff. Ms. Mayer noted that her testing was for the purpose of filling in the gaps of previous testing—she opined that the previous vocational testing was not sufficiently comprehensive, and that there was no previous testing regarding independent living skills—and was also used to confirm the results of previous testing by others. She further explained that her assessment included Student's participating in a mock employment interview and his completing an employment application.

The overall scope of Ms. Mayer's evaluation was comprehensive, including consideration of (1) Student's vision for moving from school to post-school life, (2) what evaluations have been utilized and what further evaluations need to occur in order to determine what needs to be done to facilitate this movement, (3) the school district's transition plans and implementation of those plans, (4) what gains have been made for purpose of moving Student successfully to post-school life, and (5) what additional planning and services need to be provided in order to allow Student to become successful in post-secondary education, employment, and independent community living.

Ms. Mayer found that Student's general "problem areas" were personal hygiene, socialization skills (having a lack of friends), inability to control his feelings in a variety of situations, and his lack of work experience.

In Ms. Mayer's opinion, the development of Student's transition services should be informed by an identification of Student's strengths, preferences, and interests. This information should be used to design a coordinated set of activities that focus on improving both academic and functional achievement to facilitate Student's movement from school to post-secondary activities. Ms. Mayer's report recommends that, at a minimum, these activities should address the areas of instruction, community experiences, and the development of employment and other post-school adult objectives, such as daily living skills.

Ms. Mayer testified that Student did well in a mock employment interview and was able to complete a job application. Ms. Mayer further testified that Student's strengths include having a high degree of understanding of appropriate interactions with peers and supervisors within the work setting, but this does not reflect actual skills in this area. Ms. Mayer found, based upon past history, that Student would not likely be able to apply successfully these skills when he is under stress on a job site.

Ms. Mayer testified and her report indicates that Student was observed to have good ability to take a bus from home to Middlesex Community College where he has been attending classes. However, Ms. Mayer found that Student has limited transportation skills, becoming confused when looking at different bus schedules and what the information on these schedules meant. She concluded that Student needs additional training to learn how to

understand and utilize bus schedules (particularly since he does not have a driver's license) so that he will be able to access work, school, and other activities within the community.

Ms. Mayer testified and her report reflects her belief that Student requires additional services in order to be ready to graduate. In her opinion, a wide variety of services are needed to allow Student to function within the post-secondary school environment, the work environment, and the community. Ms. Mayer specified a number of areas in which Student requires additional training, including (1) vocational training in the community (emphasizing his ability to actually complete the work, his work speed, and his work consistency), (2) learning the social culture of the work environment (including Student's having someone with him who could process any mistakes in order for Student to learn how to handle similar situations in the future), (3) developing the ability to self-assess what job characteristics are satisfactory and what are unsatisfactory for Student, (4) overall career development skills training, (5) weekly social skills training in a home or community setting (such as a college or library) by a Board Certified Behavioral Analyst, with interventions matched specifically to Student's social skills deficit areas, (6) instruction in the "hidden curriculums" across the various environments in which he functions, (7) personal hygiene instruction, (8) supports that will allow Student to gain independence in personal hygiene (this is essentially the need for organizational support for Student so that he can learn to actually do in his daily life what he already understands needs to be done), (9) additional organizational instruction so that Student will learn to independently organize multi-step tasks and assign realistic timelines to the steps. (10) instruction in math applicable to daily living situations, (11) travel training to become independent in traveling within the community (including instruction while actually riding public buses with Student so that the instruction goes beyond Student's obtaining only a conceptual understanding of what is needed), (12) consultation to allow Student to identify a peer with whom Student can develop social interaction skills, and (13) instruction on the development of self-management and self-determination skills (which includes choice-making skills, problem-solving skills, goal-setting skills, risk-taking skills, safety skills, self-advocacy skills, and self-knowledge) so that he can continue to make his own decisions about his life, so that he can change his own behavior as needed, and so that he can become independent of his family and social services agencies. Ms. Mayer testified that Student should have an IEP with measurable performance criteria and measurable objectives for generalization of skills for the purpose of implementing the above-described educational services.

Ms. Mayer also recommended that additional testing occur in order to determine the extent of Student's social skills deficits, including his specific deficit areas. She explained that one needs to look carefully at the actual social skills incidents that have occurred and what his skills actually are, so one can tease out more thoroughly what his social deficits are in practice. The assessment would be done, in part, through interviews of others who have encountered Student.

Ms. Mayer testified that, in general, Student knows what he should do in many situations and, for example, in counseling, he can talk about what he should do. Ms. Mayer opined, however, that when faced with an actual situation that causes him stress or anxiety, Student often is not been able to apply what he knows. Ms. Mayer termed this a fluency deficit, which requires training that is different than what has been provided in the past to Student.

For example, Student has learned certain organization skills while in High School. In addition, for example, Student was able to do extremely well in High School science class, where information is typically broken down into chunks of manageable information and there is an opportunity to ask questions and clarify one's understanding. Ms. Mayer testified, that nevertheless when reviewing the driver's manual on his own, Student felt overwhelmed by it as he was unable to break down the material, organize it, and access it in manageable parts. Ms. Mayer explained that without someone helping Student to do this with the driver's manual, he was not able to access it and therefore continued to be unable to obtain a driver's license. In other words, Ms. Mayer stated that while the academic learning and organizational training that Student received from Dracut were helpful in allowing Student to be successful within the High School, it did not prepare him to apply or implement what he knows into other settings—more specifically, employment, post-secondary education, and independent community living.

Ms. Mayer testified that the Dracut work internships were not sufficient because they all had very limited number of hours per week compared to actual work in the community, and Student was not exposed to the full range of situations involving interaction with the public and peers. Ms. Mayer explained that Student therefore did not experience all of the communication and social skills scenarios typically found within a job in the community. Ms. Mayer testified that one cannot assume that Student can generalize the skills that he learned and utilized within these internships.

Ms. Mayer testified that it is not appropriate for Student to graduate even though he has met certain academic standards, because the requirement of transitional services is that there needs to be a coordinated set of activities that are in place to move Student from the school environment to the environment in which he will learn, work and live after school, and, in Ms. Mayer's opinion, it is Dracut's responsibility to provide these services. Ms. Mayer stated that the process is for appropriate transitional objectives to be established by the Team in order to move Student to the next step, and once those objectives are achieved, Student should receive a diploma. She opined that this does not require Dracut to teach every skill needed to be successful as an adult, but services need to be provided to move Student in that direction.

Ms. Mayer testified that (1) Student has never received the needed transition services in employment, education, and community living; (2) the implications to Student are that he will not receive sufficient services and support to avoid employment termination because of a lack of social skills in the work place (which, in her opinion, is the principal reason people are terminated from work); (3) he would not have sufficient skills for finding new work; and (4) there would likely be a pattern of short employment followed by long periods of unemployment. Ms. Mayer testified that Student's post-secondary education and job opportunities are impacted by Student's inability to get there, so he needs additional travel transportation in order to access his education. Ms. Mayer made the following additional points in her testimony regarding Student's organizational deficits: (1) Student is likely to be successful in post-secondary education, but only with someone to provide organizational supports for Student while he is in school. (2) Currently, Student is unable to live independently and will have to continue to live with his family. (3) Student is capable of performing many independent living skills but he has an organizational deficit that precludes

17

him from understanding a schedule or how all the pieces fit together. (4) Because of his Asperger's Syndrome, Student is not able to learn these organizational skills on his own or from his peers or family, but rather requires explicit instruction in all of these areas from someone who knows how to teach these skills to someone with Student's disability. Ms. Mayer also testified that with supports, Student is likely to make a large leap to live independently. She opined that long term, without appropriate prospective services, Student will likely be dependent on welfare and social service systems, yet with a minimal investment now in appropriate transitional services, the impact on the welfare and social service systems will be minimized.

Ms. Mayer testified that each community employment experience for Student should generally last three to four months part-time, with the amount of time at work increasing over time to 20 hours per week and Student also continuing in school part-time. She explained that Student does not necessarily need to experience all four separate community-based experiences (although this is best practices, as reflected within her report) to receive appropriate transition services, but she believes that Student should receive sufficient community employment experience so that Student obtains the ability to generalize what he has learned. Accordingly, Ms. Mayer recommended that as part of Student's community employment experience, it be determined whether there is sufficient evidence that the skills taught in one job site can be utilized in another job site. She noted that Student needs to have sufficient range of experiences for these purposes.

Ms. Mayer testified that she would not necessarily recommend a job coach since this may be stigmatizing to Student. She explained that Student does not require daily coaching at work, but rather, someone needs to be at the job site initially so Student understands what is required and the timelines for completion of tasks. Ms. Mayer testified that this instruction could occur over a week or two, with fading, and then weekly consultation thereafter would be sufficient.

Ms. Mayer testified that within higher education, Student should be provided support with organizational skills, which could be taught outside of the classroom. She believes that this is the principal piece needed by Student in order to be successful in higher education.

Ms. Mayer testified that it is predictable of a student with Asperger's Syndrome, such as Student, to do extremely well academically and then have gaps on the functional side, with those gap areas needing to be separately addressed through services that are often not provided through the general curriculum.

Ms. Mayer testified that her report was presented to an IEP Team meeting in November 2008. She noted that the Dracut members of the Team concluded that the services that Dracut had been providing Student were sufficient and therefore no additional services, as recommended in Ms. Mayer's report, were added to the IEP.

**Testimony by Ms. Hart.** Debra Hart, MS, is the director of the education and transition team of the Institute for Community Inclusion. Her team includes 15 staff people working in the area of transition from secondary school to adult life. In this capacity, she has worked with over 300 school districts. Ms. Hart has a demonstrated expertise regarding national

18

standards relevant to a school district's responsibility (based upon requirements found within the federal special education statute) to provide transition services and planning. She has also worked with students to develop appropriate transition plans, including many students with Asperger's Syndrome. Testimony of Hart; exhibit P-9.

Ms. Hart testified that in order to comply with federal statutory standards regarding transition services, Student's IEP should reflect transition services relevant to the three areas of employment, education, and community living. She noted that although each of these three areas must be addressed through transition services, the degree or extent of services will depend on the particular student.

Ms. Hart testified regarding standards developed by the National Secondary Transition Technical Assistance Center (NSTTAC). The purpose of NSTTC is to assist states to build capacity to support and improve transition planning, transition services, and transition outcomes for youth with disabilities. Their standards are premised upon the transition planning and transition services requirements contained with federal special education law (IDEA 2004). She explained that NSTTAC Indicator # 13 pertains to students aged 16 years and above who have an IEP with transition services, and a checklist for Indicator # 13 asks seven questions for purpose of determining whether the IEP meets the NSTTAC standards. Testimony of Hart; exhibit P-10, P-11.

The checklist for Indicator # 13 includes seven questions which focus on whether an IEP, on its face, includes an appropriate, measurable postsecondary goal or goals. Ms. Hart testified that pursuant to the checklist, as well as under IDEA 2004, an IEP must address appropriately the three specific transition areas of (1) education or training, (2) employment, and, (3) independent living as needed. Ms. Hart noted that Student's own vision statement relates to all three transition areas.

Ms. Hart testified that she has reviewed Student's IEPs for the past three years, has reviewed his other educational records, including evaluations, and has spent approximately one and one-half hours interviewing Student. In her testimony, she compared Student's IEPs over the past three years with the NSTTAC Indicator # 13 checklist.

Ms. Hart testified that, in her opinion, each of Student's IEPs over the course of the past three years was deficient with respect to each of the seven questions posed by the Indicator # 13 checklist. In particular, Ms. Hart stated that (1) the IEPs did not include any measurable postsecondary goals sufficient to address any of the three specific transition areas (described above); (2) the IEPs addressed only social, emotional, and organizational skills, which represent only a "sliver" of what is needed to cover the three specific transition areas; and (3) Dracut's vocational assessment was insufficient because it was only a formal (and not also a situational) assessment and because it addressed only one of the three specific transition areas (employment), with the result that Dracut's assessments were insufficient to determine Student's postsecondary goals (Ms. Hart compared the HMEA observation/evaluation conducted by Ms. Mayer, which she found to be more thorough).

In her testimony, Ms. Hart reviewed each of the transition plans that are part of Student's most recent three IEPs and found each to be inadequate for purposes of addressing Student's

19

transition needs in light of his educational profile. Ms. Hart listed the following deficiencies in the transition plans: (1) Dracut should provide opportunities for Student to find out information about a variety of real work situations within the community, (2) Dracut should help Student learn how to access activities (such as recreational opportunities) in the community, (3) Dracut should not limit its transition services to school-based activities but rather should provide Student with opportunities to practice his skills within the actual environments (including paid employment) in which he will be participating after High School, and (4) Dracut should address Student's needs in each of the three specific transition areas. She testified that as part of its mandated transition services, Dracut should provide Student with support in his post-secondary educational, employment, and community environments—for example, an educational coach who could help Student navigate his academic and non-academic environments and whose participation would fade over time.

**Evaluation and Testimony by Mr. Brooks.** Over the course of two days in August 2007, Brad Brooks, M.Ed. conducted a McCarron-Dial Systems Vocational Evaluation of Student. Dracut arranged for this evaluation at Parent's request. Mr. Brooks testified that his evaluation of Student consisted of the following three parts: a battery of tests, including a vocational interests test; a situational assessment that involves Student's working in a placement for a day; and an observational inventory filled out by Ann Nicholson (Student's special education teacher at Dracut High School). The evaluation explained that the tests administered to Student are designed to assess intellectual functioning, sensory/motor ability, coping adaptive behavior, and emotional strengths and limitations. Testimony of Brooks; exhibit P-14.

Mr. Brooks testified that the evaluation results indicated that Student has mild impulsivity (i.e., occasionally overreacting in an impulsive manner), an occasional difficulty "standing up" to stress, and an inability to understand the effect of his own conduct on the performance or morale of others. Mr. Brooks stated that, in his opinion, Student has the ability to take college courses. Mr. Brooks also noted that Student would not be appropriate for any of the transition programs at the Merrimack Education Collaborative, which programs are generally for persons diagnosed with mental retardation, because Student has the skills to continue his education with support from public agencies such as the Massachusetts Rehabilitation Commission. Finally, Mr. Brooks testified that it would be valuable for Student to participate in simulated employment situations in the community. Testimony of Brooks; exhibit P-14 (page 5).

Mr. Brooks' evaluation results generally were that "vocational counseling and guidance with minimal job search may be needed." Also, the evaluation concluded that Student's predicted residential level is within the "community living" range, indicating that Student is capable of "autonomous" living within the community with minimal need for assistance. Exhibit P-14 (page 4).

Mr. Brooks' report made a number of recommendations, including the following:

> [Student] may want to continue to take advantage of opportunities to explore career options which take advantage of his many vocational strengths and interests. This exploration will provide [Student] with more choices on which to base his future

career decisions and gain better understanding of what is expected at a job. This may also provide a supportive environment in which to learn to relate effectively with co-workers and supervisors.

Exhibit P-14 (page 10).

## V. DISCUSSION

### A. Introduction to FAPE Standards

It is not disputed that Student is an individual with a disability, and that at least through June 6, 2008 (Student's graduation date), he fell within the purview of the federal Individuals with Disabilities Education Act (hereinafter, "IDEA")[3] and the Massachusetts special education statute.[4] Pursuant to the IDEA and state special education statute, Student was entitled to receive a free appropriate public education (FAPE) in the least restrictive environment.[5]

The Supreme Court has explained that under the federal statute, FAPE is intended to require special education services that provide a "basic floor of opportunity" to a disabled student,[6] allowing the student to access public education.[7] Access must be meaningful,[8] but need not maximize a student's educational potential.[9]

---

[3] 20 USC 1400 *et seq.*

[4] MGL c. 71B.

[5] 20 USC 1400(d)(1)(A); 20 USC 1412(a)(1)(A); MGL c. 71B, ss. 1, 2, 3.

[6] *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 201 & n.23 (1982).

[7] *Rowley,* 458 U.S. at 192 (1982) ("intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside").

[8] *Rowley,* 458 U.S. at 192 ("in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful"). The Supreme Court in *Rowley* also utilized the phrase "some educational benefit." *Rowley,* 458 U.S. at 200 ("Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child"). The "some benefit" phrase may be understood, in the context of the *Rowley* decision as a whole, to require "meaningful" benefit. See *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 395 (3d Cir. 2006), citing *T.R. ex rel. N.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (phrase "some educational benefit", as utilized by Supreme Court in *Rowley*, requires provision of a "meaningful educational benefit"). See also *Lauren P. v. Wissahickon School Dist.*, 2009 WL 382529 (3rd Cir. 2009) (IEP must confer "significant learning" and "meaningful benefit" on student); *N.B. v. Hellgate Elementary School Dist.*, 541 F.3d 1202, 1212-13 (9th Cir. 2008) (under 1997 amendments to the IDEA, a school must provide a student with a "meaningful benefit" which is more than "some educational benefit"); *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 364 (2nd Cir. 2006) (IDEA requires a student to be provided with "meaningful access" to education); *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 319 (4th Cir. 2004) ("state must provide children with 'meaningful access' to public education"); *Alex R.. v. Forrestville Valley Community Unit School Dist. # 221,* 375 F.3d 603, 612 (7th Cir. 2004) (question presented is whether the school district appropriately addressed the student's needs and provided him with a meaningful educational benefit), *cert. denied*, 543 U.S. 1009 (2004); *Deal v. Hamilton County Board of Education,* 392 F.3d 840 (6th Cir. 2004); *Shore Regional High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004); *Houston Independent School District v. Bobby R.*, 200 F.3d 341 (5th Cir. 2000); *Adams v. Oregon*, 195 F.3d 1141, 1145 (9th Cir. 1999); *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 789 (1st Cir. 1984) ("federal basic floor of meaningful, beneficial educational opportunity"), *aff'd* 471 U.S. 359 (1985).

[9] *Rowley*, 458 U.S. at 197, n.21 (1982) ("Whatever Congress meant by an "appropriate" education, it is clear that it did not mean a potential-maximizing education."); *Lt. T.B. ex rel. N.B. v. Warwick Sch. Com.,* 361 F.3d 80, 83 (1st Cir. 2004) ("IDEA does not require a public school to provide what is best for a special needs child, only that it

In addition, FAPE is defined by the IDEA to include state educational standards.[10] The Massachusetts educational standards are found within state statute and state education regulations.[11] Massachusetts standards provide that the special education services must be designed to develop the student's educational potential.[12]

In determining the quantum of educational benefit necessary to satisfy the IDEA, the Supreme Court has explicitly rejected a bright-line rule. Noting that children of different abilities are capable of greatly different achievements, the Court instead adopted an approach that requires consideration of the potential of the particular student.[13] Lower federal courts, as well as Massachusetts special education regulations, similarly require the sufficiency of a student's progress to be judged within the context of his individual potential or capacity to learn.[14]

---

provide an IEP that is 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law.").

[10] 20 USC 1401(9)(b); *Winkelman v. Parma City School Dist.,* 127 S.Ct. 1994, 2000-2001 (2007) ("education must … meet the standards of the State educational agency); *Mr. I. v. Maine School Administrative District No. 55,* 480 F.3d 1, 11 (1st Cir. 2007) (state may "calibrate its own educational standards, provided it does not set them below the minimum level prescribed by the [IDEA]"). See also Philip T.K. Daniel & Jill Meinhardt, *Valuing the Education of Students with Disabilities: Has Government Legislation Caused a Reinterpretation of a Free Appropriate Public Education?,* 222 Educ. L. Rep. 515 (2007) (language of the 2004 Reauthorization of the IDEA as well as the implementing Regulations "likely implies that FAPE now requires more than mere access to a basic floor of opportunity and should be aligned with the high expectations in state educational standards").

[11] MGL s. 71B, s.1 (definition of FAPE, describing Massachusetts educational standards as those "established by statute or established by regulations promulgated by the board of education").

[12] MGL c. 71B, s. 1 (defining the term "special education" to mean "educational programs and assignments including, special classes and programs or services designed to develop the educational potential of children with disabilities"). *See also* MGL c. 69, s. 1 ("paramount goal of the commonwealth to provide a public education system of sufficient quality to extend to all children the opportunity to reach their full potential "); 603 CMR 28.01(3) (identifying the purpose of the state special education regulations as "to ensure that eligible Massachusetts students receive special education services designed to develop the student's individual educational potential"); *Mass. Department of Education's Administrative Advisory SPED 2002-1: Guidance on the change in special education standard of service from "maximum possible development" to "free appropriate public education" ("FAPE"), Effective January 1, 2002,* 7 MSER Quarterly Reports 1 (2001) (appearing at www.doe.mass.edu/sped) (Massachusetts Education Reform Act "underscores the Commonwealth's commitment to assist all students to reach their full educational potential").

[13] *Rowley,* 458 U.S. at 202.

[14] E.g., *Lessard v. Wilton Lyndeborough Cooperative School Dist.,* 518 F.3d 18, 29 (1st Cir. 2008) ("levels of progress must be judged with respect to the potential of the particular child. So here: while the reported progress is modest by most standards, it is reasonable in the context of Stephanie's manifold disabilities and low IQ"); *Beth R. v. Forrestville Valley Comm. Unit Sch. Dist. No. 221,* 375 F.3d 603, 615 (7th Cir. 2004) ("requisite degree of reasonable, likely progress varies, depending on the student's abilities"), *cert. denied,* 125 S. Ct. 628 (2004); *Shore Regional High School Bd. of Educ. v. P.S.,* 381 F.3d 194, 198 (3d Cir. 2004) ("IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential") (Alito, J.); *Deal v. Hamilton County Board of Education,* 392 F.3d 840 (6th Cir. 2004) ("IDEA requires an IEP to confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue"); *Houston Independent School District v. Bobby R.,* 200 F.3d 341 (5th Cir. 2000) (progress should be measured with respect to the individual student, not with respect to others); *Mrs. B. v. Milford Board of Ed.,* 103 F.3d 1114, 1122 (2d Cir. 1997) ("child's academic progress must be viewed in light of the limitations imposed by the child's disability"); 603 CMR 28.05(4)(b) (Student's IEP must be "designed to enable the student to progress effectively in the content areas of the general curriculum"); 603 CMR 28.02(18) ("*Progress effectively in the general education program* shall mean to make documented growth in the acquisition of knowledge and skills, including social/emotional development, within the general education program, with or without accommodations, according to chronological age and

Massachusetts and federal educational standards require that a student's IEPs be designed to enable him to make effective progress.[15] And, the IEPs must be custom tailored to meet a student's "unique" needs so that he or she will receive sufficient educational benefit.[16]

## B. Transition Plans and Services; Services for Older Students under Mass. Regulations

At the heart of the instant dispute is a disagreement as to whether Dracut has provided Student with appropriate transition plans, as well as appropriate transition services pursuant to these plans, in compliance with its obligations under state and federal special education law.

The IDEA requires transition services, which are developed through transition planning by the IEP Team. The IDEA sets forth a number of requirements regarding transition services. The statute begins by defining the term "transition services" as follows:

> The term "transition services" means a coordinated set of activities for a child with a disability that--
>
> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
>
> (B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and
>
> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.[17]

---

developmental expectations, the individual educational potential of the child, and the learning standards set forth in the Massachusetts Curriculum Frameworks and the curriculum of the district [emphasis supplied].").

[15] Massachusetts standards: 603 CMR 28.05(4)(b) (IEP must be "designed to enable the student to progress effectively in the content areas of the general curriculum"); 603 CMR 28.02(18) (defining *Progress effectively in the general education program*). Federal standards: 20 USC 1400(d)(4) (purposes of this title are . . . to assess, and *ensure the effectiveness of*, efforts to educate children with disabilities" (emphasis added); *Lenn v. Portland School Committee*, 998 F.2d 1083, 1090 (1st Cir. 1993); *Roland v. Concord School Committee*, 910 F.2d 983, 991 (1st Cir. 1990) ("Congress indubitably desired 'effective results' and 'demonstrable improvement' for the Act's beneficiaries"); *North Reading School Committee v. Bureau of Special Education Appeals*, 480 F.Supp.2d 479, 489 (D.Mass. 2007) (educational program "must be reasonably calculated to provide effective results and demonstrable improvement in the various educational and personal skills identified as special needs").

[16] 20 USC 1400(d)(1)(A) (IDEA enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living"); 20 USC 1401(9), (29) ("free appropriate public education" encompasses "special education and related services," including "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability"); *Honig v. DOE*, 484 U.S. 305, 311 (1988) (FAPE must be tailored "to each child's unique needs"); *Lessard v. Wilton Lyndeborough Cooperative School Dist.*, 518 F.3d 18, 23(1st Cir. 2008) (noting the school district's "obligation to devise a custom-tailored IEP").

[17] 20 USC 1401(34).

23

The federal DOE regulations similarly define the term "transition services" as follows:

§300.43 Transition services.

(a) Transition services means a coordinated set of activities for a child with a disability that--

(1) Is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

(2) Is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and includes--

(i) Instruction;

(ii) Related services;

(iii) Community experiences;

(iv) The development of employment and other post-school adult living objectives; and

(v) If appropriate, acquisition of daily living skills and provision of a functional vocational evaluation.

(b) Transition services for children with disabilities may be special education, if provided as specially designed instruction, or a related service, if required to assist a child with a disability to benefit from special education.[18]

Beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter, the IEP Team must include the following within each IEP:

(aa) appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills;

(bb) the transition services (including courses of study) needed to assist the child in reaching those goals ....[19]

By statute, Massachusetts recently lowered the age to 14 years old for beginning transition services.[20]

Transition services are part of, and not separate from, a school district's responsibility to provide FAPE. Whether a student's transition planning and services are appropriate must therefore be considered within the context of the purposes of FAPE, as well as within the

---

[18] 34 CFR 300.43.

[19] 20 USC § 1414 (d)(1)(A)(i)(VIII). See also 34 CFR §300.320(b).

[20] Section 2 of chapter 71B of the Massachusetts General Laws was amended by Chapter 285 of the Acts of 2008 to require that beginning at age 14, or sooner if determined appropriate by the IEP Team, school age children with disabilities are entitled to transition services and measurable postsecondary goals, as provided under the IDEA.

court decisions interpreting the FAPE standard (discussed above in part V.A. of this Decision).[21]

The IDEA provides that a principal purpose of FAPE is to "prepare [students] for further education, employment, and independent living."[22]  This has led the First Circuit to state that "the IDEA exists, in part to ensure children with disabilities receive an education preparing them for employment."[23]  The United States Supreme Court has further stated that Congress passed the IDEA, in part, so that students with disabilities could "achieve a reasonable degree of self-sufficiency" and "become a contributing part of our society."[24]  The Sixth Circuit has similarly explained that "[a]t the very least, the intent of Congress appears to have been to require a program providing a meaningful educational benefit towards the goal of self-sufficiency, especially where self-sufficiency is a realistic goal for a particular child."[25]

The statutory and regulatory provisions regarding transition services, quoted above, make clear that transition services are to be developed through an "outcome-oriented process." Transition services may be special education or related services.  There is no explicit limit placed on the amount or type of transition services to be provided.  Transition services are to be developed on the basis of the student's particular needs, taking into account his strengths, preferences, and interests.

The First Circuit has provided further guidance regarding transition services, explaining that when evaluating the sufficiency of a school district's transition services under the IDEA, the transition services must be considered "in the aggregate and in light of the child's overall needs."[26]  "The test is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits."[27]  Also, as with other parts of FAPE, the transition services requirement "does not imply a substantive standard or a particular measure of progress" but rather "specifies the perspective that participants in the process should strive to attain but does not establish a standard for evaluating the fruits of that process."[28]  At the same time, Congress has noted the importance of providing "effective" transition services under the IDEA.[29]

---

[21] *Lessard v. Wilton Lyndeborough Cooperative School Dist.*, 518 F.3d 18, 28-30 (1st Cir. 2008) (applying FAPE standards to determine whether transition services were appropriate).

[22] 20 USC 1400(d)(1)(A).  *See also Mr. I. v. Maine School Administrative District No. 55*, 480 F.3d 1, 12 (1st Cir. 2007) ("Maine's broad definition of 'educational performance' squares with the broad purpose behind the IDEA: 'to ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'").

[23] *Mr. and Mrs. I v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 18 (1st Cir. 2007) (citation omitted).

[24] *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 201 n.23 (1982).

[25] *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 864 (6th Cir. 2004).  See also *Kevin T. v. Elmhurst Community School Dist. No. 205*, 2002 WL 433061, *12 (N.D.Ill. 2002) (transition services are "[t]o ensure that disabled students can adequately function in society after graduation").

[26] *Lessard v. Wilton Lyndeborough Cooperative School Dist.*, 518 F.3d 18, 30 (1st Cir. 2008) (interpreting the IDEA prior to the 2004 amendments).

[27] *Id.*

[28] *Id.* at 28.

[29] 20 USC 1400(c)(14) ("providing effective transition services to promote successful post-school employment or education is an important measure of accountability for children with disabilities").

court decisions interpreting the FAPE standard (discussed above in part V.A. of this Decision).[21]

The IDEA provides that a principal purpose of FAPE is to "prepare [students] for further education, employment, and independent living."[22]  This has led the First Circuit to state that "the IDEA exists, in part to ensure children with disabilities receive an education preparing them for employment."[23]  The United States Supreme Court has further stated that Congress passed the IDEA, in part, so that students with disabilities could "achieve a reasonable degree of self-sufficiency" and "become a contributing part of our society."[24]  The Sixth Circuit has similarly explained that "[a]t the very least, the intent of Congress appears to have been to require a program providing a meaningful educational benefit towards the goal of self-sufficiency, especially where self-sufficiency is a realistic goal for a particular child."[25]

The statutory and regulatory provisions regarding transition services, quoted above, make clear that transition services are to be developed through an "outcome-oriented process." Transition services may be special education or related services.  There is no explicit limit placed on the amount or type of transition services to be provided.  Transition services are to be developed on the basis of the student's particular needs, taking into account his strengths, preferences, and interests.

The First Circuit has provided further guidance regarding transition services, explaining that when evaluating the sufficiency of a school district's transition services under the IDEA, the transition services must be considered "in the aggregate and in light of the child's overall needs."[26]  "The test is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits."[27]  Also, as with other parts of FAPE, the transition services requirement "does not imply a substantive standard or a particular measure of progress" but rather "specifies the perspective that participants in the process should strive to attain but does not establish a standard for evaluating the fruits of that process."[28]  At the same time, Congress has noted the importance of providing "effective" transition services under the IDEA.[29]

---

[21] *Lessard v. Wilton Lyndeborough Cooperative School Dist.*, 518 F.3d 18, 28-30 (1st Cir. 2008) (applying FAPE standards to determine whether transition services were appropriate).

[22] 20 USC 1400(d)(1)(A).  *See also Mr. I. v. Maine School Administrative District No. 55*, 480 F.3d 1, 12 (1st Cir. 2007) ("Maine's broad definition of 'educational performance' squares with the broad purpose behind the IDEA: 'to ensure that all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'").

[23] *Mr. and Mrs. I v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1, 18 (1st Cir. 2007) (citation omitted).

[24] *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 201 n.23 (1982).

[25] *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 864 (6th Cir. 2004).  See also *Kevin T. v. Elmhurst Community School Dist. No. 205*, 2002 WL 433061, *12 (N.D.Ill. 2002) (transition services are "[t]o ensure that disabled students can adequately function in society after graduation").

[26] *Lessard v. Wilton Lyndeborough Cooperative School Dist.*, 518 F.3d 18, 30 (1st Cir. 2008) (interpreting the IDEA prior to the 2004 amendments).

[27] *Id.*

[28] *Id.* at 28.

[29] 20 USC 1400(c)(14) ("providing effective transition services to promote successful post-school employment or education is an important measure of accountability for children with disabilities").

Transition planning and services have been further addressed in other federal district court opinions and hearing officer decisions. These opinions and decisions have generally noted the importance of transition services in allowing a student to be prepared for post-high school education, employment, and independent community living.[30] Also, the Massachusetts Department of Elementary and Secondary Education (DESE) has developed a mandatory transition form to be utilized by school districts.[31]

I will also consider whether Dracut has complied with the related Massachusetts regulatory requirement that a school district make available to older special education students the following: continuing education; developing skills to access community services; developing independent living skills; developing skills for self-management of medical needs; and developing skills necessary for seeking, obtaining, and maintaining jobs.[32]

In light of these federal and Massachusetts statutory, regulatory, and judicial standards, I will review Student's unique transition needs; I will consider whether Dracut's transition services

---

[30] *Elizabeth M. v. William S. Hart Union High School Dist.*, 2003 WL 25514791, *4 (C.D. Cal. 2003 ("adequate high school education is inextricably linked to a successful transition to post-secondary education"); *J.B. v. Killingly Board of Education,* 990 F.Supp. 57 (D.CT 1997) (student "could receive instruction in community living and social skills, including daily living skills, appropriate behavior, socialization, and working skills, as part of his transition services"); *Yankton School District v. Schramm*, 900 F.Supp. 1182 (D.S.D. 1995) ("Transition services are 'aimed at preparing students (soon to leave school) for employment, *postsecondary education,* vocational training, continuing and adult education, adult services, *independent living,* or community participation.'") (emphasis in original), aff'd 93 F.3d 1369 (8ᵗʰ Cir. 1996); *In Re East Hartford Board of Education*, 50 IDELR 240 (SEA CT 2008) (student's transition needs not properly addressed by IEP); *In Re: Mason City Community School District*, 46 IDELR 148 (Iowa SEA 2006); *In Re: Quabbin Public Schools*, 11 MSER 146 (SEA MA 2005) (noting the importance of appropriate transition services for purposes of a student's post-school life); *Whitehall-Coplay School District*, 37 IDELR 39 (SEA PA 2002) (transition plan must include "a coordinated set of activities, services, and experiences designed to narrow the gap between [student's] current functioning and the demands of the chosen environment" such as college, work or community in which student is likely to spend her early adult life); *Livermore Valley Joint Unified School District,* 33 IDELR 288 (CA SEA 2000) (transition planning and services considered to be an essential part of student's prescribed course of study); *Student v. Novato Unified School District, SN 886-94*, 22 IDELR 1056 (CA SEA 1995) (IDEA mandates regarding transition planning and services "create a separate substantive entitlement"); *Yankton School District*, 21 IDELR 772 (South Dakota SEA 1994) ("transitional services such as are requested by TS's parents can stand alone as a special education program").

[31] The form requires that a school district develop "an ACTION PLAN needed to achieve the POST-SECONDARY VISION by outlining the skills the student needs to develop and the courses, training, and activities in which the student will participate." In developing the Action Plan, the DESE transition form further requires the school district to consider with respect to employment such options as "part-time employment, supported job placement, service learning projects, participation in work experience program. job shadowing, internships, practice in resume writing/ interviewing skills, the use of a one-stop resource center and job specific skills in areas such as customer service, technology," and to consider with respect to community experiences and post-school adult living such options as "participation in community based experiences, learning how to independently access community resources, building social relationships, managing money, understanding health care needs, utilizing transportation options and organizational skills." The DESE transition form may be found at: http://www.doe.mass.edu/sped/28MR/28m9.doc

[32] The regulations (603 CMR 28.06(4)) provide, in relevant part, as follows:

> **Programs for older students.** The school district shall ensure that options are available for older students, particularly those eligible students of ages 18 through 21 years. Such options shall include continuing education; developing skills to access community services; developing independent living skills; developing skills for self-management of medical needs; and developing skills necessary for seeking, obtaining, and maintaining jobs. …

appropriately addressed those needs for the purpose of enabling Student to make meaningful and effective progress towards being prepared for postsecondary education, employment, independent living, and community participation, and for purpose of achieving a reasonable degree of self-sufficiency; I will consider whether Dracut satisfied the Massachusetts requirement regarding programs for older students; I will then determine whether each IEP, when viewed in its entirety, is reasonably calculated to enable Student to garner sufficient educational benefit; and finally, I will determine what relief, if any, is appropriate.

**Transition Assessments.** The IDEA requires that a school district conduct "age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills ...."[33] Dracut did not conduct an appropriate transition assessment regarding any of these four areas.

Dracut's only relevant assessment was a vocational assessment that was performed at Parent's request. It is self-evident that this assessment did not address other areas important to Student—that is, postsecondary education and independent living skills. In addition, the vocational assessment performed by Dracut was insufficient even for the purpose of determining Student's vocational needs because it was only a formal (and not also a situational) assessment. In addition, Dracut did not conduct this assessment in a timely manner.[34] Testimony of Hart, Mother.

Other, more comprehensive and useful assessments (for example, Dr. Levine's assessment, Ms. Abele's two assessments, and Ms. Mayer's assessment) were conducted by Parents. Parents shared these assessments with Dracut, and Dracut apparently considered them at IEP Team meetings but declined to utilize the assessments or adopt any of their recommendations because the Dracut members of the IEP Team apparently concluded that Student was making sufficient progress in High School without the need for any additional transition services. Testimony of Abele, Mayer, Cotter.

Without appropriate evaluations being conducted or considered by Dracut, it was not possible for Dracut to understand the nature and scope of Student's deficits as those deficits pertained to his transition from High School to postsecondary education, employment, and independent living. This led directly to Dracut's failure to propose appropriate transition plans and services.[35]

**Dracut's Transition Plans.** The IDEA requires that Dracut develop, as part of its transition plans, "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent

---

[33] 20 USC § 1414 (d)(1)(A)(i)(VIII)(aa) (emphasis supplied). See also 34 CFR §300.320(b).

[34] Parent requested a vocational evaluation on December 20, 2006. The vocational assessment was eventually completed in August 2007. Testimony of Parent, Stone; exhibits P-14, P-16, P-28, P-29, P-30.

[35] Cf. *N.B. v. Hellgate Elementary School Dist., ex rel. Bd. of Directors, Missoula County. Mont.*, 541 F.3d 1202, 1210 (9th Cir. 2008) ("without evaluative information that C.B. has autism spectrum disorder, it was not possible for the IEP team to develop a plan reasonably calculated to provide C.B. with a meaningful educational benefit"); *Branham v. Government of the Dist. of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005) ("DCPS's repeated failure to evaluate Terrance led to a 'paucity' of record evidence about Terrance's disability. The record provides no insight about the precise types of educational services Terrance needs to progress.").

living skills ....”[36] Dracut is then required to provide the "transition services (including courses of study) needed to assist the child in reaching those goals ....[37]

Student's transition needs, as well as his vision statements, indicated that Student should receive transition services to address his deficits regarding the three principal areas of postsecondary education, employment, and independent living. Yet, Dracut's IEPs did not include any goals to effectively address Student's vocational needs and independent living skills deficits. Exhibits P-16, P-19, P-21, S-12, S-15, S-24, S-25. Inevitably, this limited Dracut's ability to develop transition services in the transition plans, since the transition services are driven by what is necessary for the student to reach his postsecondary goals.

**Student's Pragmatic language Deficits.** In January 2005 and May 2007, Ms. Abele conducted observations and evaluations of Student's functional pragmatic language skills. In each instance, she prepared a written report, which was shared with the IEP Team.[38]

Ms. Abele's testimony and reports were persuasive and effectively unrebutted, and I so find, that Student had and continues to have basic pragmatic language deficits, that these deficits were first identified by her in January 2005, and that these deficits have not been addressed in any meaningful way by Dracut since at least 2005. Student's pragmatic language deficits may be summarized as follows: (1) failure to understand the conversational hierarchy and listening hierarchy necessary to have a schema of the skills of talking with a conversational partner; (2) inability to organize and relate personal event narratives by telling mini-monologues within a conversation, which are used to make a connection with a conversational partner; and (3) lack of "self-talk" skills —that is the ability to evaluate and reflect upon, and then edit and filter one's own thoughts before acting or speaking.

As a consequence of these deficits, Student lacks the skills necessary to be included in classroom discussion in a meaningful manner and to connect with others in a reciprocal manner. For example, Student tends to say too much on subjects of interest to him and is not skilled at taking into consideration the interests, perspective, and needs of the other person in the conversation. Thus, he has limited skills relative to the reciprocity of conversation. Similarly, Student is generally unaware of what language is or is not appropriate within a specific context and therefore does not have the ability to adjust his language accordingly— for example, he was not able to distinguish between what would be appropriate speech within a 1:1 conversation as compared to what would be appropriate speech within a classroom context. In addition, Student is generally unaware of non-verbal communication of others, and therefore is not able to receive and make use of this information. Awareness of non-verbal communication is a necessary part of effective communication since so much of what is communicated is done non-verbally. Student also does not have the ability to

---

[36] 20 USC § 1414 (d)(1)(A)(i)(VIII)(aa) (emphasis supplied). See also 34 CFR §300.320(b).

[37] 20 USC § 1414 (d)(1)(A)(i)(VIII)(bb) (emphasis supplied). See also 34 CFR §300.320(b).

[38] Ms. Abele, who is a licensed and certified speech-language pathologist, has extensive knowledge, experience, and expertise regarding the social or pragmatic language needs of high functioning students on the autism spectrum and, in particular, of students with Asperger's Syndrome. She has in the past (and continues) to provide consultation to many school districts in Massachusetts regarding these issues; the consultations involve presenting workshops, and working with groups of children as well as individual students to address pragmatic language deficits. Testimony of Abele; exhibits P-6 (resume), P-7, P-8. Her expert testimony was careful, thorough, candid, and credible.

monitor his own participation in conversation and to make adjustments to conform to the expectations of those with whom he is speaking. Testimony of Abele; exhibits P-7, P-8.

Similarly, the February 1, 2006 report of Karen Levine, PhD, as well as Dr. Levine's testimony identified Student's social pragmatic deficits as including the following: (1) Student's timing of conversation was off and he did not check in with the listener; (2) his voice volume and body orientation were inappropriate to the situation; (3) he had difficulty with timing and turn-taking in conversation, often reverting to his own topic rather than maintaining the topic of the conversation, and (4) he had difficulty with social referencing (i.e., non-verbally observing what someone is talking about). Testimony of Levine; exhibit P-4 (2nd page).

The practical implications of Student's pragmatic language deficits are substantial and far-reaching. Ms. Abele testified persuasively, and I so find, that although the development of appropriate pragmatics language skills is only one part of Student's education, the implications of deficits in this area are pervasive in that they are likely to jeopardize Student's success in higher education, employment, and living independently. This is because in whatever context Student participates after High School, in order to be successful he has to communicate in a manner that is in conformity with the general expectations within that particular context and that does not break the written or unwritten rules of behavior. He also has to be able to receive information from others through verbal and non-verbal communication so that he can apply his intelligence and skills. As a practical matter, for example, Student has the skills and knowledge to obtain employment but does not have the pragmatic language skills to be successful at work and hold a job. Ms. Able testified persuasively, and I so find, that if Student does not develop appropriate and adequate pragmatic language skills, he is likely to go in and out of higher education and in and out of jobs, with the result that he as at risk of becoming discouraged, staying at home, and failing to realize his potential to live independently. Testimony of Abele; exhibits P-7, P-8.

Student's pragmatic language deficits and the implications of those deficits regarding his participation in postsecondary education were amply illustrated by the testimony of Professor Davis, who taught Student an English composition class during the first semester of the 2008-2009 school year at Middlesex Community College. Ms. Davis explained that she found Student to be likeable and intelligent, Student attended every class, and he passed her course, but Student was completely unsuccessful in following the classroom protocol regarding classroom discussion. Ms. Davis testified that Student would loudly answer her questions without waiting for her to call on Student or anyone else to answer, Student did not stay on topic when answering a question (for example, his answer would drift into personal, unrelated stories) without apparently realizing that he had gone off on a tangent, Student would "talk over" other students when they spoke, Student would speak for inappropriately long periods of time, and he made it not possible to interrupt him without being rude (nevertheless, Ms. Davis resorted to interrupting him at times). Ms. Davis stated that a number of other students became distracted, angry, and frustrated by Student's conduct in the classroom, and they complained to Ms. Davis. Ms. Davis testified that almost on a daily basis, she spoke with Student regarding his manner of participation in classroom discussion, and he seemed to understand what Ms. Davis was concerned about, but Student was never able to improve his manner of classroom participation. She stated that because of Student's

disruptive conduct, it was extremely difficult to teach her class with Student as a member of it, and she would not like to have Student participate in any discussion-based class of hers in the future. Testimony of Davis.

Similarly, a letter from the Middlesex Community College Dean of Students, dated October 3, 2008, indicated that Student exhibited "continued interruptions" in the classroom and that if Student could not change his behavior and participate appropriately in the classroom, Student risked being removed from the class or the college. Exhibits P-44, P-45.

It is not disputed that Student has the educational potential to learn pragmatic language skills. He is intelligent and motivated to learn, and he has a relatively strong understanding of content language (for example, vocabulary). Yet it is also undisputed that, at the same time, because of his disability of Asperger's Syndrome, Student does not have the innate ability to learn from context or the environment what language to use. In other words, he does not have the ability to model his language from others by observing and copying what language they are utilizing, as might be done by a regular education student. Testimony of Abele.

Consequently, in order to address his pragmatic language deficits, it is necessary that Student be provided a specific curriculum that is taught to him systematically on a step-by-step basis, with a significant amount of practice with a language pragmatics teacher and at least one peer. In order to make meaningful gains in language pragmatics, these skills need to be taught with consistency, need to be taught over a period of time, and need to be taught within a variety of contexts in which Student will be actually functioning after High School.

Although Ms. Abele presented her observations, evaluations, and recommendations to Dracut in 2005 and again in 2007, Dracut declined to adopt any of her recommendations regarding Student's need for special education and related services to address his pragmatic language deficits. As a result, these deficits were unaddressed by Dracut throughout his High School years.[39]

**Student's Social Skills Deficits**. It is not disputed that Student has social skills deficits, but the extent of these deficits remains unclear. Dracut witnesses testified that Student appeared to interact normally with his peers at the High School, particularly during his junior and senior years, and Student became friendly with members of the track team. Testimony of Berard, Cotter, Nicholson, McLarney.

Dracut's services to Student, Student's opportunity to participate in track, and the passage of time allowed Student to function within the High School environment by his junior year in a manner that, at least to the outside observer, reflected relatively normal social relationships

---

[39] At the evidentiary hearing in the instant dispute, Dracut made clear that the IEP Team declined to follow Ms. Abele's recommendations and, more specifically, never proposed to provide Student with the discrete training in language pragmatics recommended by Ms. Abele because Student was observed to be successful in the High School with the result that Dracut deemed Ms. Abele's proposed services not to be needed. Instead, to address Ms. Abele's concerns, Dracut staff consulted with the Dracut autism specialist (Ms. Cotter) and through the IEP Team process, offered counseling twice each week and a social group. However, Dracut conceded, through the testimony of Ms. Cotter, that these services offered or provided by Dracut were not the systematic, step-by-step instruction required to address Student's underlying pragmatic language deficit. Testimony of Mother, Abele, Cotter.

within peers and staff at the High School. However, none of this has made it possible for Student to have normal social relationships with others outside of the High School environment.

Student and Parent were persuasive that these social relationships did not carry outside of the High School. Since June 2008, when Student stopped going to the High School, his daily routine speaks to the implications of Student's limited social skills. Student does not leave the house by himself except to go to his classes at Middlesex Community College twice each week. He does not have friends. He does not have visitors at home. He does not talk to anyone on the phone. A typical day for Student is to get up late, he spends time on the computer, researching prices to buy computer parts and repairing computers, and he stays up late. Testimony of Mother, Student; exhibit P-43 (page 3).

In October 2008, Michele Mayer (Education Specialist and Board Certified Behavioral Analyst) conducted, at Parents' request, a readiness-to-graduate assessment of Student.[40] This assessment revealed that Student has significant, continuing, unaddressed deficits that will preclude his being successful in postsecondary education, employment, and independent living. Student's deficit areas pertain to his difficulties with organization, vocational skills, travel, and social skills. Testimony of Mayer; exhibit P-43. I will address Student's social skills deficits in this section, and the other areas will be addressed separately below.

Ms. Mayer's testing found that Student has minimal socialization skills. Student's social skills deficits will inevitably impact upon multiple areas of his life. For example, Ms. Mayer testified persuasively that lack of appropriate social skills in the work place is the principal reason people are terminated from employment. This deficit will also likely impact negatively on Student's ability to live independently. Testimony of Mayer; exhibit P-43.

Dr. Levine testified persuasively that Student needs continuing support regarding social situations as he moves from the High School environment to less protected environments in the community. She explained that in any environment where there are variables new to him, Student has to re-learn how to act and respond. She noted that Student can be taught to adapt to new situations, and he can be successful within a new environment when it becomes familiar to him and he learns what is expected of him, but he requires support to make this transition since he is not capable of intuitively generalizing what he has learned previously.

For these reasons, I find that Student has substantial deficits regarding social skills, that Dracut did not provide services to allow Student to develop social skills that can be applied after High School, that Student is capable of learning these social skills, but that without learning these skills, Student's ability to succeed in employment and independent community living is severely compromised.

---

[40] Ms. Mayer has been conducting these assessments for the past 14 years, and a significant percentage of the assessments (and of her overall professional experience) involve students diagnosed with Asperger's Syndrome. Ms. Mayer has been engaged by and worked with approximately 25 to 30 school districts for purpose of assessing the transitional needs (and how to meet them) of their students. Typically, it is a school district, rather than an individual, that has engaged Ms. Mayer to conduct this kind of assessment over the past 14 years. Testimony of Mayer. Her expert testimony was careful, thorough, candid, and credible.

I agree with Ms. Mayer's recommendation that additional testing should occur in order to determine the extent of Student's social skills deficits, including his specific deficit areas. She explained that one needs to look carefully at the actual social skills incidents that have occurred and what his skills actually are, so one can determine more thoroughly what his social deficits are in practice. It is anticipated that, subsequent to this evaluation, Dracut will need to propose social skills services, with interventions matched specifically to Student's social skills deficit areas.

**Student's Organizational Deficits.** Student is intelligent and has significant potential to succeed, but his organizational deficits frequently preclude him from being able to apply his intelligence or to implement consistently and appropriately what he already knows how to do. Testimony of Mayer; exhibit P-43.

Related to Student's organizational deficits are what Ms. Mayer referred to as Student's "fluency deficit". Student knows what he should do in many situations and, for example, in counseling, he can talk about what he should do. However, that when faced with an actual situation that causes him stress or anxiety, Student often is not been able to apply what he knows. This "fluency deficit" requires training that is different than what has been provided in the past to Student. Testimony of Mayer; exhibit P-43.

Dracut provided organizational supports as part of Student's IEPs. These skills, together with academic learning, allowed Student to be successful academically within the supported environment of Dracut High School. For example, Student received an A+ in his senior-year science class where information was typically broken down into chunks of manageable information and there is an opportunity to ask questions and clarify one's understanding of the materials. Testimony of Mayer; exhibit P-43.

Dracut's organizational supports were not designed for the purpose of (nor did they succeed in) giving Student the ability to develop organizational skills that could be applied to post-High School tasks such as understanding a driver's manual or completing independent living activities in an appropriate or timely manner. As a result, Student has not developed organizational skills that can be applied (and are necessary to function successfully) outside of the high school environment. Student still needs to learn to independently organize multi-step tasks and assign realistic timelines to the steps. Testimony of Mayer; exhibit P-43.

Student's organizational deficits impair his ability to function successfully in many areas. For example, Student would like to have (but has not been able to obtain) a driver's license because he is unable to understand the driver's manual. Ms. Mayer testified persuasively that without someone helping Student to do break down the material in the driver's manual, and organize it, he will continue to be unable to access it and therefore will be unable to obtain a driver's license. Testimony of Mayer; exhibit P-43.

Similarly, Student is capable of performing many independent living skills but his organizational deficits preclude him from actually implementing and utilizing these skills in an appropriate and timely manner. Ms. Mayer testified persuasively that Student can gain independence in personal hygiene through organizational training and support so that he can

learn to actually do in his daily life what he already understands needs to be done. Currently, for example, Student knows how to brush his teeth and take a shower, but typically he does not brush his teeth and he takes a shower only before leaving home two days each week to take classes. Testimony of Mayer; exhibit P-43.

Ms. Mayer testified persuasively that Student is likely to be successful in postsecondary education only if someone provides organizational supports for Student. These supports can be provided outside of the classroom. Testimony of Mayer; exhibit P-43.

Because of his Asperger's Syndrome, Student is not able to learn these organizational and fluency skills on his own or from his peers or family, but rather requires explicit instruction from someone who knows how to teach these skills to someone with Student's disability. Student has the educational capacity to learn these skills, and with appropriate teaching, Student is likely to make substantial progress.

**Student's Need for Vocational Training**. Ms. Mayer also testified persuasively regarding (and her report reflects) the need for specifically-focused vocational training for Student. This should include (1) vocational training in the community (emphasizing his ability to actually complete the work, his work speed, and his work consistency), (2) learning the social culture of the work environment, (3) developing the ability to self-assess what job characteristics are satisfactory and what are unsatisfactory for Student, and (4) overall career development skills training. Testimony of Mayer; exhibit P-43.

As part of this training, Student requires sufficient employment experiences in job sites within the community so that he obtains the ability to generalize what he has learned. He needs to have sufficient range of experiences for these purposes. Ms. Mayer recommended that each community employment experience for Student should generally last three to four months part-time, with the amount of time at work increasing over time to 20 hours per week. At the same time, Student may continue in school part-time. Testimony of Mayer; exhibit P-43.

Ms. Mayer testified persuasively that the Dracut work internships were not sufficient because they each had a very limited number of hours per week compared to actual work in the community, and Student was not exposed to a full range of situations involving interaction with the public and peers, with the result that Student did not experience all of the communication and social skills scenarios typically found within a job in the community. Ms. Mayer's testimony was persuasive, and I so find, that while Dracut's work internships undoubtedly assisted Student by providing him with employment-like experiences, there is no basis for concluding that the skills that he learned and utilized within these internships are transferable to (and therefore are usable within) actual work sites in the community. Testimony of Mayer; exhibit P-43.

Similarly, Ms. Hart testified persuasively that in order to provide minimally useful transitional services regarding employment, Dracut should not limit its transition services to school-based activities but rather should provide Student with opportunities to practice his skills within the actual environments (including paid employment) in which he will be participating after High School. She explained that appropriate transition services typically

33

begin as school-based, but as the student gets older, the services are moved from the school to the community. Testimony of Hart. The IDEA regulations defining "transition services" specifically includes "community experiences."[41]

There may be some students who do not require community experiences in order to allow that student to succeed after high school. However, because of Student's Asperger's Syndrome, which limits his ability to apply learned skills from one environment to another, I find it necessary that Student experience employment situations within three or four community settings in order to develop usable vocational skills. These would be part-time employment experiences that would occur concurrently with Student's participating in postsecondary education, which would also be on a part-time basis. Testimony of Mayer; exhibit P-42.

**Student's Travel Skills.** Ms. Mayer found that Student has limited travel skills, for example becoming confused when looking at different bus schedules and what the information on these schedules means. She concluded that Student needs additional training to learn how to understand and utilize bus schedules (particularly since he does not have a driver's license), which is a realistic goal for Student. Currently, Student is only able to utilize public transportation for purposes of attending his classes at Middlesex Community College. Testimony of Mayer; exhibit P-43.

Ms. Mayer testified persuasively, and I so find, that Student requires additional travel training so that he will be able to access work, school, and other activities within the community. Travel training should address Student's need to become independent in traveling within the community. This should include instruction while actually riding public buses with Student so that the instruction goes beyond Student's obtaining only a conceptual understanding of what is needed. Testimony of Mayer; exhibit P-43.

**Dracut's Arguments to the Contrary.** By Dracut's standards, Student was doing well at the High School and needed no special education or related services other than what were being offered. Dracut witnesses testified that by Student's junior year, Student's social skills had improved, Student appeared to be relaxed in his interactions with other students, and other students interacted with him in the same way that they would interact with any other students; and that during Student's junior and senior years, he had the ability to modify his behavior so that it was appropriate at the High School. Testimony of Cotter, McLarney, Nicholson, Mazzola, Generoso.

For example, at lunch time, Student was observed to have appropriate behavior and to be appropriately interacting with his peers—for example, he did not eat alone, and he engaged in appropriate conversations with others. Also, Student was an enthusiastic participant (as a shot-putter) in winter track during his junior and senior years, and he got along well with everyone on the track team. Testimony of Cotter, McLarney, Nicholson, Mazzola, Generoso, Berard.

---

[41] 34 CFR 300.43(a)(2)(iii).

Student was also succeeding academically. His teachers believed that he had fewer needs over time as Student matured over the course of his four years at the Dracut High School. By the second half of his senior year, Student's teachers generally believed that he was performing well academically, and he required little re-direction. They believed that, in general, any difficult issues regarding Student could be addressed through a quick discussion between Student and one of his teachers. By senior year, Student was receiving grades of As and Bs, including an A+ in a college-preparatory science class. Testimony of Cotter, McLarney, Nicholson, Mazzola, Generoso, Stone.

Student's success at the High School was further evidenced by his track teammates awarding Student the "Team Spirit" award at the end of his junior year; Student's receiving the Fran Kelley award (given to a student whose participation in track has helped overcome obstacles) in his senior year; and Student's receiving three scholarship awards (of $1500, $500, and $500) in 2008. Testimony of Berard, Generoso, Mother; exhibits S-3 (3rd page), S-30.

As a result of Student's success within the High School, Student's teachers and staff concluded that his conduct and behavior did not indicate that he needed assistance with development of social skills, and Dracut staff found that there was no need for specialized training of his teachers regarding Student's disabilities and how to work with him. Testimony of Cotter, McLarney, Nicholson, Mazzola, Generoso, Stone.

It is apparent that over time, Student adjusted sufficiently well to the High School environment so that he could succeed academically and socially. Student's peers and teachers likely made any necessary adjustments to his social and pragmatic language deficits. Yet, at the same time, as illustrated by Ms. Abele's classroom observation of Student near the end of his junior year (May 1, 2007) at the High School, Student still did not understand the rules and expectations of discussions in a classroom. He was continuing to evidence pragmatic language deficits that resulted in his asking questions and making comments that were inappropriate within a group or community context and would be appropriate only if he were the only student in the classroom—that is, a 1:1 tutorial. Testimony of Abele; exhibit P-7. It also was painfully obvious from Student's and Parent's testimony that any social successes at the High School did not translate into social success outside of school.

This illustrates the fundamental disconnect between the positions of the parties in the instant dispute. The Dracut witnesses testified enthusiastically and persuasively regarding Student's apparent successes in High School, as reflected in his grades, participation in sports, awards, and peer relationships. Relying upon Student's apparent success during High School, Dracut provided additional services intended to assist with vocational training (for example, the bank and computer internships), but left unaddressed deficits that virtually preclude his transitioning successfully to postsecondary education, employment, and independent living.[42]

---

[42] The Eighth Circuit in *Yankton School Dist. v. Schramm*, 93 F.3d 1369, n.6 (8th Cir. 1996) summarized a similar situation as follows:

> A very bright, disciplined, and determined student, Tracy appears to be headed for college. Preparing disabled students for postsecondary education is one of the reasons for transition services under the IDEA. Under the statute, her success in high school, due in part to the special education she receives, should not prevent her from receiving whatever transition services she may need to be equally successful in college.

Dracut made its decisions regarding transition services not out of any bad faith. The Dracut witnesses were persuasive that they, in fact, believed that what they had provided Student was useful and sufficient. However, without the benefit of any appropriate transition assessments (other than Parents' assessments, which Dracut did not utilize) and without the benefit of any Dracut staff or consultants who have expertise regarding the transition needs of someone with Student's educational profile, Dracut staff were simply unable to understand sufficiently the implications of Student's disabilities on his life after High School. Mr. Brooks was the only possible expert in this regard, but he simply did not have sufficient depth or breadth of knowledge and experience to provide a persuasive expert opinion, particularly in contrast to each of Parents' four experts.

**Findings and Conclusions**. On the basis of the evidence discussed above, I make the following additional findings and conclusions:

- Dracut did not conduct appropriate transition assessments, in contravention of the IDEA (20 USC § 1414 (d)(1)(A)(i)(VIII)(aa); 34 CFR §300.320(b)). Dracut also did not utilize Parents' transition assessments, which were appropriate. As a result, Dracut did not propose IEPs (including transition plans and services) based upon appropriate transition assessments of Student's particular transition needs, in contravention of the IDEA (20 USC § 1414 (d)(1)(A)(i)(VIII)(bb); 34 CFR §300.320(b)).

- Student had and continues to have basic pragmatic language deficits because of Asperger's Syndrome. These deficits have left Student unable to participate successfully in postsecondary education, employment, and independent living and preclude Student from achieving a reasonable degree of self-sufficiency. Student had and continues to have the educational capacity to ameliorate these deficits with appropriate instruction. In 2005 and again in 2007, Dracut was informed of these deficits and Student's need for services to address them. Dracut made a conscious decision not to address these deficits in a manner that would reasonably likely facilitate his transition to postsecondary education, employment, and independent living. Testimony of Abele, Cotter; exhibits P-7, P-8.

- Student had and continues to have organizational and social skills deficits because of Asperger's Syndrome and Attention Deficit Hyperactivity Disorder. These deficits have left Student unable to participate successfully in postsecondary education, employment, and independent living and preclude Student from achieving a reasonable degree of self-sufficiency. Student had and continues to have the educational capacity to ameliorate these deficits with appropriate instruction. Dracut has been aware of these deficits and has provided or offered services for the purpose of allowing Student to be successful academically in Dracut High School. However, Dracut has provided no services that were reasonably likely to address these deficits in a manner that would facilitate Student's transition to postsecondary education, employment, and independent living. Testimony of Mayer, Levine, Hart; exhibits P-3, P-4, P-43.

- Student has substantial, continuing needs for vocational training and travel training. Dracut provided employment internships, but these opportunities were not reasonably calculated to enable Student to develop vocational skills needed to be successful after High School. Dracut has not attempted to address Student's need for travel training. As a result, Student is substantially unprepared to realize his potential to participate successfully in postsecondary education, employment, and independent living and precludes Student's achieving a reasonable degree of self-sufficiency. Testimony of Mayer, Hart; exhibit P-43.

- When Congress first decided to include transition services within the IDEA in 1990, it noted that when individuals are not prepared to make the transition into the post-school environment "[y]ears of special education will be wasted while these individuals languish at home, their ability to become independent and self-sufficient (therefore making a positive contribution to society) placed at significant risk."[43] On the basis of unrebutted expert testimony, I conclude that this statement applies to Student. That is, without appropriate transition services, Student is likely to go in and out of higher education and in and out of jobs, with the result that he is at significant risk of becoming discouraged, staying at home, and failing to realize his potential to live independently. Over time, Student is at significant risk of becoming dependent on welfare and social service systems. On the other hand, a relatively small investment in appropriate transition services now will likely result in substantial long-term benefits for Student. Testimony of Abele, Mayer, Levine.

- Thus, Dracut did not propose or provide transition services reasonably calculated to facilitate Student's successful transition to postsecondary education, employment, and independent living. Considering this within the context of the IEPs as a whole, I conclude that Dracut's IEPs at issue in this dispute denied Student FAPE.

- Dracut has not provided Student with effective special education and related services designed to (1) develop skills to access community services; (2) develop independent living skills; and (3) develop skills necessary for seeking, obtaining, and maintaining jobs, in contravention of Massachusetts special education regulations (603 CMR 28.06(4)).

I now turn to consideration of what relief is appropriate.[44]

---

[43] H.R.Rep. No. 101-544, 101st Cong., 2d Sess. 9, *reprinted in* 1990 U.S.Code Cong. & Admin. News 1723, 1732-33, quoted in *Todd D. by Robert D. v. Andrews*, 933 F.2d 1576, n.2 (11th Cir. 1991).

[44] Parent and Student argue that Student also needs instruction in the development of self-management and self-determination skills (which includes choice-making skills, problem-solving skills, goal-setting skills, risk-taking skills, safety skills, self-advocacy skills, and self-knowledge) so that he can continue to make his own decisions about his life, so that he can change his own behavior as needed, and so that he can become independent of his family and social service agencies. Parent and Student also seek remedial math educational services. I have little doubt that these services would be helpful to Student. However, neither the testimony, the evaluations, nor any other evidence is persuasive that these services are a necessary part of Student's transition from High School. I also note that Student has taken a remedial math course after High School. In short, Parents and Student did not meet their burden of persuasion on this part of the dispute.

**Relief.** When a school district fails to provide a student with FAPE, compensatory services must be considered. Compensatory services are an equitable remedy involving discretion in determining what relief is appropriate after consideration of all aspects of the case.[45] Compensatory services should be designed to make a student whole–that is, to make up for what was lost as a result of not having received the requisite special education services.[46] As one federal court has instructed, the decision-maker needs to make "an informed and reasonable exercise of discretion regarding what services [Student] needs to elevate him to the position he would have occupied absent the school district's failures."[47] This may include future services to make up for what was lost.[48]

Based on the evidentiary record of what transition services should have been provided and how long it will likely take Dracut to make up for this, I find that Student is entitled to two additional years of transition services and services for older students under Massachusetts regulations. These additional services are justified on the basis of the following factors, which are discussed in greater detail above: (1) Dracut's failure to provide any appropriate services to address Student's pragmatic language deficit even after receiving two expert reports demonstrating this need, and the unrebutted testimony that it may take Student two years to receive the necessary instruction to address this deficit, (2) Dracut's failure to provide needed community-based work internships, and persuasive testimony that Student may need as many as four separate community-based work internships, each lasting as long as four months, with some period of time between internships, (3) the need to conduct a social skills assessment, which in turn may require development and delivery of instruction over a substantial period of time, and (4) Dracut's general failure to properly and timely assess Student's need for transition services or propose appropriate transition plans for the two year period from May 2006 to May 2008. Testimony of Abele, Mayer.

I conclude that it is necessary for Student's eligibility to continue under the IDEA and state special education regulations for two years for purposes of receiving the above-referenced compensatory services. I reach this conclusion for the following reasons.

As discussed throughout this Decision, Student requires a wide range of transition services that have not been provided to date. As compared to many other compensatory education disputes, Student cannot be made whole simply by my ordering easily identified and discrete special education or related service for a particular period of time. For example, the extent of

---

[45] See, e.g., *C.G. ex rel. A.S. v. Five Town Community School Dist.*, 513 F.3d 279, 290 (1st Cir. 2008) (compensatory education is a "discretionary remedy").

[46] See, e.g., *C.G. ex rel. A.S. v. Five Town Community School Dist.*, 513 F.3d 279, 290 (1st Cir. 2008) ("compensatory education is . . . a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA"); *G. ex rel. RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 309 (4th Cir. 2003) ("Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student."); *Pihl v. Mass. Dept. of Ed.*, 9 F.3d 184 (1st Cir. 1993) ("compensatory education is available to remedy past deprivations"); *Lester H. v. Gilhool*, 916 F.2d 865 (3rd Cir. 1990), cert. denied 499 U.S. 923, 111 S.Ct. 317 (1991) (compensatory education is intended to be "an appropriate remedy to cure the deprivation of a child's right to a free appropriate public education"); *Miener v. State of Missouri*, 800 F.2d 749 (8th Cir. 1986) (compensatory education intended to cure the deprivation of a handicapped child's statutory rights).

[47] *Reid v. District of Columbia*, 401 F.3d 516, 527 (D.C. Cir. 2005). See also *Draper v. Atlanta Independent School System*, 518 F.3d 1275, 1289 (11th Cir. 2008)

[48] *Pihl v. Mass. Dept. of Ed.*, 9 F.3d 184, 189 (1st Cir. 1993) (The IDEA "may require services at a future time to compensate for what was lost").

the vocational education services required by Student, as well as the instruction to address Student's pragmatic language deficits, will depend upon how quickly he learns and how readily he is able to apply what he has learned to a variety of contexts. In addition, social skills instruction will need to be developed based upon an assessment that has not yet been completed.

Appropriate transition services can only be provided pursuant to the development of a transition plan that describes a coordinated set of activities focused on improving Student's ability to move successfully to postsecondary education, employment, and independent living. The implementation of the plan will need to be monitored and adjustments made over the course of the two-year period in response to the parties' changing understanding of Student's needs (for example, as a result of the social skills assessment) and Student's progress.

All of this argues in favor of continued eligibility in order that the various substantive and procedural requirements relevant to transition services will continue to apply to Student.

This raises the question of whether Student should be precluded from receiving his high school diploma so that he can continue to be eligible for transition services under state and federal special education law. It is well settled that if properly graduated from high school with a diploma, Student's right to prospective services as a special education student terminates, including his right to transition planning and services.[49] State and local standards determine when a student has completed the requisite course and examination requirements for graduation.[50] It is undisputed that Student has met all of Dracut's and Massachusetts' requirements for graduation from high school.

Dracut sought to graduate Student from Dracut High School, but this was thwarted, at least temporarily, by a stay put order earlier in the instant dispute by the BSEA Hearing Officer. A number of courts and hearing officers have concluded that a school district may be required to provide a certain minimum level of special education services (including transition services) before it will be allowed to graduate a student and thereby terminate her eligibility for prospective special education services.[51] Dracut's failure to provide

---

[49] 34 CFR 300.122(a)(3)(i); MGL c. 71B, s.1 (definition of "school age child").

[50] *Stock v. Massachusetts Hospital School,* 467 N.E. 2d 448, 392 Mass. 205 (1984), *cert. denied,* 474 U.S. 844 (1985). See also Mass. Dept. of Education *Administrative Advisory SPED 2002-4* -- REVISED (found at: http://www.doe.mass.edu/sped/advisories/02_4.html ) which provides in relevant part: "The standards for award of the high school diploma include requirements set by the district and state standards including, as of 2003, the competency determination standard."

[51] See *Kevin T. v. Elmhurst Community School Dist. No. 205,* 2002 U.S. Dist. LEXIS 4645, 36 IDELR 153 (N.D.Ill. 2002) ("To graduate a student with a disability under the IDEA, the student must meet the general graduation requirements and make progress on or complete the IEP goals and objectives."); *Chuhran v. Walled Lake Consol. Sch.,* 839 F.Supp. 465, 474 (E.D.Mich.1993) ("In order to graduate a student with a disability, the student must complete his IEP requirements and otherwise meet requirements for general graduation. "), *aff'd,* 51 F.3d 271 (6th Cir.1995); *In Re: Mason City Community School District,* 46 IDELR 148 (Iowa SEA 2006); *In Re: Quabbin Regional School District,* BSEA # 05-3115, 11 MSER 146 (MA SEA 2005) (failure to provide transition services may result in continuing eligibility notwithstanding graduation from high school); *In Re: Carver Public Schools,* BSEA # 00-2574, 7 MSER 167, 170 (SEA MA 2001) (a Hearing Officer "may declare a regular diploma invalid" where the school district has failed to provide a transition plan); *Livermore Valley Joint Unified School District,* 33

appropriate transition services may possibly be sufficient to justify an order that would preclude Dracut from granting Student his diploma until such time as appropriate transition services are provided. Student and Parents urge this approach.

However, for reasons explained below, I find that I may extend Student's eligibility for two years for the purpose of receiving appropriate and sufficient compensatory services notwithstanding his graduation from High School. Therefore, Dracut may (and should) grant Student his high school diploma at this time. I find this approach preferable since it does not interfere with Dracut's intent to graduate Student, and it allows Student to receive a high school diploma, which is one of his goals, while at the same time, it can appropriately and sufficiently compensate Student.

The First Circuit has made it clear that Student's graduation from high school (which normally would end Student's entitlement to services under the IDEA) is not a bar to his being provided compensatory services because Dracut's violations occurred while Student was eligible under the IDEA.[52] This, however, leaves unanswered the question of whether the compensatory relief may include continuation of eligibility for two years.

To my knowledge, no court has squarely addressed the question of whether compensatory services may be used to extend special education eligibility. However, after a careful and thoughtful discussion of the extent of its authority to order compensatory relief, one court effectively extended a student's eligibility for three years by ordering an award of compensatory services in the form of the school district's being required to reevaluate the student, develop and issue an IEP for the student, and serve as the student's responsible school district under the IDEA for three years even though her eligibility had ended.[53] Another court has approved a consent decree that permitted compensatory education to include extension of IDEA eligibility.[54] Another court stated: "An award of compensatory education extends the disabled student's entitlement to the free appropriate education beyond age twenty-one to compensate for deprivations of that right before the student turned twenty-one."[55] And, the First Circuit has observed that an award of compensatory services may include an "extended period of assistance beyond the statutory age of entitlement."[56] In addition, there is no doubt that after consideration of all relevant factors, a court has "broad discretion" in fashioning an order for relief in an IDEA dispute.[57] On the basis of this

IDELR 288 (CA SEA 2000) (prerequisite to awarding a valid diploma to a special education student is that adequate transition planning and services have been provided); *Student v. Novato Unified School District, SN 886-94,* 22 IDELR 1056 (CA SEA 1995).

[52] *Me. Sch. Admin. Dist. No. 35 v. R.,* 321 F.3d 9, 18 (1st Cir. 2003) (compensatory education entitles recipient "to further services, in compensation for past deprivations, even after his or her eligibility [for special education services under IDEA] has expired"); *Pihl v. Mass. Dept. of Ed.,* 9 F.3d 184, 189 (1st Cir. 1993) ("a student who was deprived of services to which he was entitled under the IDEA has a right to a remedy, in the form of compensatory education, regardless of his eligibility for current or future services under the Act." ).

[53] *Ferren C. v. School Dist. of Philadelphia,* 2009 WL 222376, *13 (E.D. Pa. 2009).

[54] *Blackman v. District of Columbia,* 2006 WL 2456413 (D.D.C. 2006). See also *Ferren C. v School Dist. of Philadelphia,* 2009 WL 222376, *13 (E.D. Pa. 2009) (parties voluntarily agreed to extend student's IDEA eligibility for one year).

[55] *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 536 (3d Cir. 1995).

[56] *Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d 184, 188 n. 8 (1st Cir. 1993) (citation omitted).

[57] See, e.g., *Florence County Sch. Dist. Four v. Carter,* 510 U.S. 7, 16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (in "fashioning discretionary equitable relief under IDEA [we] must consider all relevant factors."); *Sch. Comm. of*

authority, I conclude that where the circumstances require it, compensatory education may include extended eligibility under state and federal special education laws.

For these reasons, I find that Dracut shall provide Student with extended special education eligibility for purposes of receiving two years of additional transition services and (during the same time period) two years of services for older students under Massachusetts special education regulations.[58]   Within 30 days from the date of this Decision, Dracut shall convene an IEP Team meeting for purposes of developing a new transition plan.  Services under this new transition plan and services for older students shall commence within 60 days of the date of this Decision.  Transition services and services for older students shall continue for two years from the date of commencement of these services.

Transition services and services for older students shall be provided consistent with this Decision and shall include the following, which shall be incorporated into a transition plan:

- Systematic, step-by-step pragmatic language instruction taught with consistency over a period of time (this may occur, for example, within a pragmatics group), with the addition of a significant amount of practice with a language pragmatics teacher within a variety of contexts, including higher education and employment.
- Development of organizational skills that can be utilized within a variety of settings, including postsecondary education, employment, and independent living (including, for example, personal hygiene).
- Vocational training that includes placement and support within three or four work sites in the community, with each work site lasting for three or four months.  Work placements may be part-time, so that Student may continue to pursue part-time post-secondary education and receive other transition services at the same time.
- Travel instruction for the purpose of Student's learning to use the public transportation system and to understand the Massachusetts driver's manual.
- A comprehensive social skills assessment (part of which would include interviews of others who have encountered Student) by someone with substantial experience and expertise working with older students diagnosed with Asperger's Syndrome, and social skills training to be developed and provided on the basis of this assessment.[59]

In its development of Student's new transition plan, the IEP Team shall be guided by the recommendations of Ms. Abele and Ms. Mayer, both through their reports and testimony in

---

*Burlington v. Massachusetts,* 471 U.S. 359, 369, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (courts have "broad discretion" in fashioning appropriate relief to remedy a school district's failures under the federal special education law); *C.G. ex rel. A.S. v. Five Town Community School Dist.,* 513 F.3d 279, 290 (1st Cir. 2008) (compensatory education is a "discretionary remedy"); *Reid v. District of Columbia,* 401 F.3d 516 (D.C. Cir. 2005); *W.B. v. Matula,* 67 F.3d 484, 494-95 (3d Cir.1995) (nothing in the text or history suggesting that relief under IDEA is limited in any way)(overruled on other grounds); *Pihl v. Mass. Dept. of Ed.,* 9 F.3d 184, 188 n. 8 (1st Cir. 1993).

[58] 603 CMR 28.06(4).

[59] It may be that the Massachusetts Rehabilitation Commission or another public entity will be able to provide some of these services, thus making it unnecessary for Dracut to provide all of them.  However, all of the required services must nevertheless be included in Dracut's transition plan for Student, thus making it clear that Dracut is ultimately responsible for ensuring that the services are provided by either Dracut, Massachusetts Rehabilitation Commission or another public entity.

the instant dispute, as well as by the recommendations contained within the testimony of Ms. Hart. In addition, Dracut shall hire and compensate Ms. Abele and Ms. Mayer for sufficient consultation time so that they may (1) provide consultation to Dracut to assist in the development of the transition plan that complies with the instant Decision, (2) advise Dracut during the two-year period of extended eligibility regarding the need for any modifications to Dracut's proposed transition plan, and (3) advise Dracut regarding the appropriate implementation of its transition plan. In the event that Ms. Abele or Ms. Mayer is not able to provide this consultation, Dracut shall retain substitute consultants who are recommended by Ms. Abele or Ms. Mayer.[60]

## VI. ORDER

Since May 2006, Student was denied FAPE on the basis of Dracut's inappropriate transition planning and services and on the basis of Dracut's inappropriate services for older students. Student is entitled to extended eligibility for purposes of receiving two years of compensatory services.

By the Hearing Officer,


William Crane
Dated: March 13, 2009

---

[60] As previously noted, Ms. Mayer and Ms. Abele have extensive consultation experience working directly with school districts. In addition, the majority of their consultation work is initiated by school districts seeking their advice, rather than (as in the present dispute) Parents' seeking their assistance. I find that both experts are extremely well-qualified to provide Dracut consultation regarding Student's transition plan and services. Testimony of Abele, Mayer; exhibits P-6, P-42..

## COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

### THE BUREAU'S DECISION, INCLUDING RIGHTS OF APPEAL

### Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must obtain such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

43

## Rights of Appeal

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

An appeal of a Bureau decision to state superior court or to federal district court must be filed within ninety (90) days from the date of the decision. 20 U.S.C. s. 1415(i)(2)(B).

## Confidentiality

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

## Record of the Hearing

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.