UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                               )
DRACUT SCHOOL COMMITTEE,        )
                               )
              Plaintiff,        )
                               )
         v.                     )  CIVIL ACTION NO. 09-10966-PBS
                               )
BUREAU OF SPECIAL EDUCATION     )
APPEALS OF THE MASSACHUSETTS    )
DEPARTMENT OF ELEMENTARY AND    )
SECONDARY EDUCATION,            )
MASSACHUSETTS DEPARTMENT        )
OF ELEMENTARY AND SECONDARY     )
EDUCATION, P.A., and C.A.,      )
                               )
              Defendants.       )
_____)
```

**MEMORANDUM AND ORDER**

September 3, 2010

Saris, U.S.D.J.

**I.  INTRODUCTION**

Plaintiff Dracut School Committee ("Dracut") seeks judicial review of two decisions of the Massachusetts Department of Elementary and Secondary Education's ("DESE's") Bureau of Special Education Appeals ("BSEA") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482.  In the Initial Decision, issued on March 13, 2009, a BSEA Hearing Officer found that Dracut had failed to provide the student, C.A., who suffers from Asperger's Syndrome, Attention Deficit Hyperactivity Disorder, Bipolar Disorder, and an anxiety disorder, with a free and appropriate education ("FAPE") because

it gave inadequate transition services while he was in high school.  The Hearing Officer ordered Dracut to award C.A. his diploma, and extended his statutory eligibility for two years after graduation so that Dracut could provide him compensatory services during that time.  In the second Compliance Decision, issued on July 14, 2009, the Hearing Officer determined that Dracut had failed to comply with his initial order, which had required the school to hire and compensate two of C.A.'s experts as consultants because Dracut offered unreasonable rates of pay.

Dracut and the individual defendants, C.A., and his mother, P.A., have filed cross-motions for summary judgment.  The BSEA and DESE have not filed their own motion, but filed a lengthy opposition to Dracut's.  After hearing and review of the administrative record, the Court **ALLOWS IN PART** Dracut's motion, **ALLOWS IN PART** the individual defendants' motion, and remands the action for further proceedings.

## II.  BACKGROUND

### A.   Statutory Overview

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs and prepare them for further education, employment, and independent living . . . ."  20 U.S.C. § 1400(d)(1)(A).  In exchange for federal

funding, the States must provide all disabled children a FAPE.[1]
"To the maximum extent appropriate" children with disabilities
are to receive a FAPE in the "[l]east restrictive environment."
Id. § 1412(a)(5)(A).  Massachusetts law requires that local
school districts provide disabled children a FAPE as defined by
the IDEA and state regulations.  Mass. Gen. Laws ch. 71B, §§ 1-3;
see also 20 U.S.C. § 1401(9)(B).

The IDEA imposes procedural requirements designed to
safeguard a student's right to a FAPE, the most important of
which is the mandatory development of an individualized education
program ("IEP") by the local school district responsible for an
eligible student's education.  20 U.S.C. § 1414(d); see also Pihl
v. Mass. Dep't of Educ., 9 F.3d 184, 187 (1st Cir. 1993)
(discussing the statutory framework).  An IEP team, including the
child's parents, regular and special education teachers,
qualified and knowledgeable representatives of the local

_____

[1] The statute defines FAPE as educational services that

(A) have been provided at public expense, under public
supervision and direction, and without charge;

(B) meet the standards of the State educational agency;

(C) include an appropriate preschool, elementary
school, or secondary school education in the State
involved; and

(D) are provided in conformity with the individualized
education program required under section 1414(d) of
this title.

Id. § 1401(9).

educational agency, and other educational professionals with specialized knowledge about the child's education design the plan.  20 U.S.C. § 1414(d)(1)(B); see also Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 23 (1st Cir. 2008) (discussing these requirements).  "IEPs are by their very nature idiosyncratic," Me. Sch. Admin. Dist. No. 35 v. Mr. & Mrs. R., 321 F.3d 9, 20 (1st Cir. 2003), but must include, among other things, (1) a statement of the child's present level of academic functioning and performance; (2) measurable academic and functional annual goals for the student; (3) the intended method of measuring the student's progress toward those goals; (4) the services provided by the school to facilitate that progress; and (5) an explanation of the extent to which the student will participate in the regular education curriculum.  20 U.S.C. § 1414(d)(1)(A)(i); see also 603 Mass. Code Regs. 28.05(4) (establishing similar state regulations regarding IEP content).

Beginning at age sixteen, the IDEA mandates the provision of transition services, a coordinated set of activities that

> (A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, adult services, independent living, or community participation;

(B) is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and

(C) includes instruction, related services, community experiences, the development of employment and other post-school living objectives, and when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(34); see also id. § 1414(d)(1)(A)(i)(VIII) (establishing transition services requirement). Massachusetts law includes similar (but not identical) requirements, but requires that transition planning begin at age fourteen. Mass. Gen. Laws ch. 71B, § 2.

The school district shall ensure that options are available for older students, particularly those eligible students of ages 18 through 21 years. Such options shall include continuing education; developing skills to access community services; developing independent living skills; developing skills for self-management of medical needs; and developing skills necessary for seeking, obtaining, and maintaining jobs.

603 Mass. Code Regs. 28.06(4). The IEPs must list "appropriate measurable postsecondary goals based upon age appropriate transition assessment related to training, education, employment, and . . . independent living skills; [and] the transition services . . . needed to assist the child in reaching those goals . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa)-(bb).

A student or parent may challenge an IEP by seeking a hearing before the state special education agency. 20 U.S.C. § 1415(f); Mass. Gen. Laws ch. 71B, § 3. Federal and state regulations govern the proceedings before the agency, the BSEA in

this case.  <u>See</u> 34 C.F.R. § 300.507-13; 603 Mass. Code Regs.
28.08(5).  Decisions of a BSEA Hearing Officer are not reviewable
by the state education agency, but an aggrieved party may seek a
compliance order for a decision that is not being implemented,
603 Mass. Code Regs. 28.08(6), and may request judicial review by
filing an action in state or federal court.  20 U.S.C. §
1415(i)(2); 34 C.F.R. § 300.516.

**B.**   **<u>C.A.'s Educational History</u>**

   **1.**   **<u>Initial Experience at Dracut</u>**

   C.A., who is now twenty years old, has been diagnosed with
Asperger's Syndrome,[2] Attention Deficit Hyperactivity Disorder,
Bipolar Disorder, and an anxiety disorder.  (Administrative
Record ("AR") at 4, 1300, 1330, 1544.)  He is "a child with a
disability" as defined by the IDEA.  20 U.S.C. § 1401(3).

   C.A. began attending Dracut High School as a freshman in
2004 and soon began experiencing academic, emotional, behavioral,
and social problems, including altercations with other students.
(AR at 199, 441-43.)  In January 2005, P.A. arranged for a
private evaluation of her son by Mary Elise Abele, a speech
language pathologist, who prepared a report explaining that C.A.

---

   [2] Asperger's is an autism spectrum disorder that causes
significant social interaction difficulties and restricted and
repetitive patterns of behavior and interests.  It differs from
other disorders on the autism spectrum in its relative
preservation of linguistic and cognitive development.  (<u>See</u>
Administrative Record ("AR") at 289, 293-94, 1299, 1309-10.)

has significant pragmatic language deficits and recommending
specialized services.[3]  (<u>Id.</u> at 199, 206-08, 1332-35; <u>see also</u>
<u>id.</u> at 1321-27 (describing Ms. Abele's qualifications).)  She
observed C.A. in class and interviewed him, reporting that while
he did well academically, he "is unable to apply the skills of
social interaction in the classroom for academic tasks, like
group discussion, or in less formal times during the school day
with his peers."  (<u>Id.</u> at 1334.)  She noted that "[t]he staff at
the high school have worked hard to accommodate [C.A.] in the
academic and social areas and he has transitioned to the high
school well.  It will be important to enhance the help offered .
. . so that he can learn to control his impulsive behavior . . .
and . . . contribute [effectively]."  (<u>Id.</u> at 335.)  She
recommended a social pragmatic peer group, a safe place where he
could process difficult interactions, organizational support, and
transition planning to help him learn how to function on a job,
all of which would require an IEP.  (<u>Id.</u>)

P.A. submitted this report to Dracut, which considered it
but took no action.  (<u>Id.</u> at 199.)  As a result, P.A. placed her
son in the Spotlight Program, an independent social pragmatics
program under the guidance of Dr. Karen Levine, a clinical

---

[3] Language pragmatics is the proper understanding and use of
language in context.  (<u>Id.</u> at 614-17.)  Pragmatic language
deficits, which are characteristic of Asperger's Syndrome, impair
one's ability to understand the meaning and appropriate use of
language in social situations.  (<u>Id.</u>)

psychologist.  (<u>Id.</u> at 336-38, 1302-04.)  He attended the program for three hours every other week from 2005 to 2006.  (<u>Id.</u>)

In his sophomore year, C.A.'s behavior led to a six-week suspension after he brought a letter opener to school in January 2006.  (<u>Id.</u> at 200, 338, 407-08.)  Shortly thereafter, P.A. arranged an independent psychological evaluation of her son with Dr. Levine.  (<u>Id.</u> at 200, 204-06, 1294-1301.)  Dr. Levine interviewed C.A. for several hours and administered a Social Communication Questionnaire, used to screen for Autism spectrum disorder.  (<u>Id.</u> at 1294-99.)  Her conclusions were consistent with his diagnoses of Asperger's, Bipolar Disorder, and a Schizotypal Personality Disorder, the last based on peculiar ideation in which C.A. claimed to see Biblical figures who speak to him and advise him on daily activities, like taking an aspirin or how to answer questions on a test.  (<u>Id.</u> at 1298, 1301.)

Dr. Levine noted that her findings were consistent with C.A.'s past evaluations, particularly his difficulty in reading affective signs in conversation and engaging in an actual reciprocal dialogue, notwithstanding his intelligence and humor. (<u>Id.</u> at 1301.)  She recommended that Dracut develop an IEP to provide a comprehensive program to address his significant needs, which she felt required "a total therapeutic approach informed by specialists highly experienced in working with individuals with his profile."  (<u>Id.</u> at 1300-01.)  On the basis of this report and its own conclusion that his behavior in bringing the letter

opener to school was the result of his disability, Dracut
determined that C.A. was eligible for special education
services.[4]  (<u>Id.</u> at 200, 338-39, 408.)

### 2.   **The IEPs**

While he remained integrated in regular education classes,
Dracut provided additional services for C.A. through several
IEPs, only the last three of which are relevant under the IDEA's
statute of limitations.  20 U.S.C. § 1415(b)(6)(B).  The first
IEP ran from May 8, 2006, to May 7, 2007, beginning at the end of
C.A.'s sophomore year and continuing through most of his junior
year at Dracut.  (<u>Id.</u> at 198, 1451-65.)  The plan offered various
accommodations to address C.A.'s needs (e.g., preferential
seating and permission to leave classes early to avoid crowded
hallways), as well as direct services, including counseling by
the school adjustment counselor thirty minutes per week, a social
group provided by special education staff for twenty-five minutes
per week, consultation with the school autism/inclusion
specialist thirty minutes per week, and consultation with the
school counselor fifteen minutes per week.  (<u>Id.</u> at 1455, 1459.)

A "Transition Planning Chart" included in the first IEP
lists various "desired outcomes," indicating that C.A. was
"considering furthering his education in the field of computer

---

[4] Prior to February 2006, C.A. received accommodations under
Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.
(<u>Id.</u> at 200, 1206.)

programming and software.  [He] expresses an interest in

attending college upon graduating." (<u>Id.</u> at 1464.)  The chart

also listed "action plans" under the following headings:

> <u>Daily Living Skills and Needs</u>: [C.A.] is independent in
> the school environment.  He is currently taking
> accounting through Dracut High School.  A 688 referral
> will be made next year.

> <u>Course of Study</u>: Currently, [C.A.] is enrolled in
> college preparation classes at Dracut High School. His
> anticipated graduation is in June 2008.  He has
> qualified for special education services in the areas
> of behavior, social and emotional needs.  He receives
> services from the Autism Specialist to address his
> social and behavioral needs.  He also receives
> counseling services which focus on his social/emotional
> needs.  We propose that he also participate in a social
> group.

> <u>Employment</u>: Counselor has offered to [C.A.] some
> assistance in developing a letter to future employers
> that will describe his disability characteristics and
> to provide them with a sense of the accommodations he
> will need to support his employment.

> <u>Community Experiences</u>: The school personnel has had
> discussions around other sport related activities that
> [C.A.] could participate in at whatever level possible.
> His coach has discussed other opportunities for him to
> manage or assist the coach during other seasons.

(<u>Id.</u> at 1464-65.)  The IEP included several measurable benchmarks

with regard to behavior, but none directly related to transition

planning for employment or independent living.  (<u>See id.</u> at

1457.)  These objectives focused exclusively on C.A.'s tendency

to make offensive or off-topic comments in class, for which the

team developed two behavior plans.  (<u>Id.</u> at 1466-69.)

    The second IEP ran from February 6, 2007, to February 5,

2008.  In addition to the general curriculum and other

accommodations, it included consultation with the Autism/
Inclusion specialist thirty minutes per week, counseling with the
school adjustment counselor thirty minutes per week, and ten
minute sessions with a special education teacher "as needed."
(Id. at 1441.)  C.A.'s vision statement, included with the IEP,
expressed his desire to graduate, attend college, work with
computers, and learn to communicate and express himself
appropriately.  (Id. at 1435-36, 1450.)  He noted specifically,
"I need classes in socialization[,]" and "I need to learn how to
say the right words to people."  (Id. at 1450.)  The transition
plan was identical to the first IEP.  (Id. at 1446-47.)

The third IEP ran from February 6, 2008, to June 10, 2008,
in C.A.'s last semester at Dracut.  The IEP listed accommodations
and services similar to the second plan, but included a more
substantial transition plan, informed partly by a two-day
vocational assessment of C.A. conducted by Dracut contractor Brad
Brooks, M.Ed., on August 7, 2007, at P.A.'s request.[5]  (Id. at
214; 1371-1409.)  Mr. Brooks' two-day assessment of C.A.
consisted of multiple tests, including the McCarron-Dial Systems

---

[5] This assessment followed an internal review finding that
"the District's transition planning was sporadic" and DESE
findings regarding incomplete implementation of transition
planning requirements by Dracut: "Teams neglect to consider the
action plan necessary to achieve . . . post-high school outcomes.
In a few instances, there was not a clear linkage between a
student's course of study, the vision established by the
stakeholders (parents and students) and the planning activities
conducted by the Team."  (Id. at 588, 1365-67.)

Vocational Evaluation, which includes intellectual, sensory, motor, emotional, coping/adaptive behavior, and memory assessments, and a Wide Range Interest Opinion Test to assess vocational interests.  (Id. at 1372-73.)  It also included a one-day situational assessment in which Mr. Brooks observed C.A. working in a real world setting at the Community Catering Company in Billerica.  (Id. at 1379.)

In discussing the situational assessment, he noted that C.A. "arrived on time and ready to work[,]" and that "[a]lthough he remained low key, he was willing to follow all directions given and appropriately accepted constructive feedback."  (Id.)  His supervisor for the day "spoke highly of [his] attitude and production," but noted that his work pace might not be fast enough for a typical cafeteria setting "and that he occasionally became overwhelmed if more than one task were given to him at one time."  (Id.)  Mr. Brooks concluded that C.A. adapted well to the environment, acted appropriately with his coworkers, responded well to instruction, and "remained productive and kept a positive attitude" throughout the day.  (Id.)  Mr. Brooks' conclusions and recommendations made no mention of C.A.'s pragmatic language or social skills challenges, and made only a few vague suggestions (e.g., improving math skills pertaining to daily living and exploring many career options).  (Id. at 1380-81.)

In addition to a more detailed transition plan, the third IEP provided for vocational services.  Specifically, it contained

a "wellness internship" during gym class, a banking internship
where C.A. would work at the school's on-site credit union,
interacting with peers and customers, participation in a computer
internship, and completion of several accounting, money
management, and higher level computer classes.  (Id. at 1429.)
The plan also included a referral to the Massachusetts
Rehabilitation Commission and recommended that C.A. pursue part-
time or volunteer employment and opportunities out of school.
(Id.)  It did not address independent living skills.

     P.A. rejected effectively all of these three IEPs, except
for portions describing C.A.'s strengths and present levels of
performance.  (Id. at 1424-25, 1444-45, 1462-63.)  She noted
repeatedly that the proposed services were acceptable only if
provided by a person trained and highly qualified in the area of
Asperger's Syndrome, although P.A. accepted some of the services
offered in September 2006.  (Id. at 200, 339-40, 353, 1424-25,
1445, 1462.)  She also rejected the proposed June 2008 graduation
date.  (Id. at 1424.)  Her correspondence discussing the rejected
IEPs emphasized the need for "a Transition Plan that would enable
[C.A.] to successfully move on to college, employment, and that
would help him to function independently (including traveling)
after high school."  (Id. at 1445; see also id. at 1119.)  The
parties engaged in numerous IEP team meetings drafting and
revising the plans, at which P.A. frequently emphasized her son's

need for social skills and pragmatic language services.  (See generally id. at 1107-73, 1485-86.)

### 3.   C.A.'s Progress and Further Assessments

The parties paint different pictures C.A.'s progress under the IEPs.  Dracut staff noted improvement in his behavior and social skills, allowing him to operate effectively in the high school environment.  (See id. at 200-01, 410-12, 443-46, 466, 476-77, 479-81, 590.)  They observed more relaxed, natural contact with peers in the halls and cafeteria.  (See, e.g. id. at 443, 479.)  C.A. remained on-topic more often and required little redirection from teachers and staff.  His organizational skills showed improvement with help from the school Learning Center staff.  (Id. at 464.)  He performed well in his classes, including an A+ in a college preparatory science course during his senior year, and achieved a final grade point average of 2.97, with a class rank of 103rd in a class of 264 students. (Id. at 26, 202, 502.)

C.A. also became an enthusiastic member of the track team, where he developed a group of friends with whom he ate lunch at school.  (Id. at 201, 445-46, 504, 556, 569-70.)  Dracut staff observed him interacting with these peers positively during his junior and senior years.  (Id. at 446.)  He received a "Team Spirit" and a statewide award in his senior year, as well as several scholarship awards.  (Id. at 558-61.)  He participated in

the internships described above during the spring of his senior year, which Dracut believed gave him adequate employment experiences to pursue his goals of attending college and working with computers.  (<u>Id.</u> at 414, 425, 489-91, 968-69, 1163.)

P.A. disputes much of this progress, pointing to a physical altercation with another student in January 2008, for which C.A. was suspended.  (<u>Id.</u> at 365-66.)  She also noted that any social success he experienced in the form of the casual conversations that Dracut staff observed between class and in the cafeteria did not carry over outside of school.  (<u>See, e.g.</u>, <u>id.</u> at 356.)  She argues that her son required more dedicated support in the areas of language pragmatics, social, vocational, and transportation skills, services that she tried repeatedly to have added to his IEPs and for which she attempted to compensate by enrolling him in a private program at her own expense.  (<u>Id.</u> at 201, 366-67.)  In November 2006, she brought a behavior specialist to an IEP team meeting, who recommended a social skills program for C.A., which Dracut rejected.  (<u>Id.</u> at 340-42.)

Ms. Abele conducted a follow-up evaluation in May 2007 and prepared a report indicating that, while he had matured notably since her initial evaluation, C.A.'s pragmatic language deficits remained unaddressed and required services to address them, which Dracut declined to adopt.  (<u>Id.</u> at 643, 1328-31.)

> He exhibits signs of difficulty with the use of
> language in context/behavioral regulation in classes.

> [C.A.] exhibits the typical AS trait of operating in a
> classroom as though he were in a one-to-one tutorial
> with the teacher, not in a group or community of
> learners.  This interferes with the class, with his
> learning the content, and separates him rather than
> connecting him with both peers and teachers. [C.A.]
> badly needs explicit learning of the skills of
> learning/working in a group context so that he can not
> only benefit from school, but transfer those skills to
> the workplace so that he can be successful there.
> These skills can be taught in a Pragmatic Language
> Group where his neurological profile is accounted for
> and the steps of those interactional features are
> taught to him specifically.

(Id. at 1330.)  Dracut initially offered a social skills group,
which it believed was appropriate.  However, it did not offer
even this skills group to address pragmatic language in the last
two IEPs because it believed C.A.'s social skills had improved to
the point where they were appropriate.  (See Pl.'s Statement of
Material Facts ¶ 36; AR at 446 (noting that C.A. had created his
own social group through the track team); AR at 443, 445-46, 466,
479 (noting observations of Dracut staff of C.A. interacting
appropriately with teachers and peers).)

Since leaving Dracut High School in June 2008, C.A. spends
the majority of his time at home.  (AR at 204.)  He sleeps late,
uses the computer, and does not socialize with friends.  (Id. at
204, 321-26.)  He has poor personal hygiene and leaves the house
only twice a week to attend classes at Middlesex Community
College ("MCC").  (Id. at 198, 204, 321-26.)  While P.A. has
taught him to take the bus to college, he knows only one bus
route and has been unable to learn the driver's manual to obtain

-16-

a license.   (<u>Id.</u> at 204, 322-23.)   P.A. states that her son is
unable to complete employment applications, though this testimony
conflicts with one of her experts' reports.   (<u>Compare</u> <u>id.</u> at 204,
326, <u>with</u> <u>id.</u> at 1548.)   His disabilities have caused him to be
"completely unsuccessful" following classroom protocol in
discussion-based classes at MCC.   (<u>Id.</u> at 204, <u>see also</u> <u>id.</u> at
1568-69 (noting possibility of disciplinary action due to C.A.'s
continued inappropriate behavior).)

In October 2008, during the pendency of the administrative
proceedings, Michele Mayer, the Vice President of Children's and
Transitional Services for Horace Mann Educational Associates,
conducted a readiness-to-graduate assessment of C.A. at his
parents' request.   (<u>See</u> <u>id.</u> at 1542-67.)   Ms. Mayer's evaluation
indicated that C.A. had significant problems with personal
hygiene, socialization skills, inability to control his feelings
in various situations, and a lack of work experience.   (<u>Id.</u> at
209.)   She described a more general "fluency deficit" that caused
C.A. to have difficulty applying what he knows when faced with
new or stressful situations, and explained that the training
provided by Dracut was not effective in addressing this
fundamental problem.   (<u>Id.</u> at 1559.)   Ms. Mayer concluded that
C.A. was not prepared to graduate as a result of these issues,
even though he had completed the formal requirements.

**C.**   **<u>The Administrative Proceedings</u>**

C.A. and P.A. requested a hearing on May 29, 2008, seeking a finding that Dracut had failed to provide adequate transition services prior to his anticipated graduation date and that it must continue to provide transition services after that date as compensatory education.  (Id. at 1-10.)  They filed a motion before BSEA Hearing Officer Lindsay Byrne seeking an emergency stay put order pursuant to 20 U.S.C. § 1415(j) that would allow C.A. to participate in his June 2008 graduation ceremony without accepting or receiving his high school diploma pending the resolution of the case on its merits.  (Id. at 13-19.)  Hearing Officer Byrne allowed the motion.  (Id. at 20-21.)  See also Verhoeven v. Brunswick Sch. Comm., 207 F.3d 1, 3 (1st Cir. 1999).

In August 2008, Hearing Officer Byrne allowed a joint motion to postpone the hearing while Ms. Mayer assessed C.A.'s readiness to graduate.  (Id. at 54-57.)  The matter was reassigned to Hearing Officer William Crane (the "Hearing Officer"), who conducted a three day hearing on December 11, 2008, January 22, 2009, and February 2, 2009.  (Id. at 100, 195.)  Over those three days, the Hearing Officer received seventy-five exhibits and heard testimony from more than a dozen witnesses, including both C.A. and P.A., numerous Dracut staff, and several of P.A.'s experts, including Ms. Levine, Ms. Abele, Ms. Mayer, and Debra Hart, a transition specialist.  (Id. at 195-96.)

On March 13, 2009, the Hearing Officer issued a decision finding that Dracut had denied C.A. with a FAPE by providing

-18-

inadequate transition services.  (<u>Id.</u> at 230-31.)  He determined nonetheless that C.A. was ready to graduate and that Dracut "may (and should)" award him a diploma.  (<u>Id.</u> at 234.)  He also ordered two years of extended IDEA eligibility and required Dracut to provide two years of compensatory transition services, for which he determined C.A. was eligible notwithstanding the receipt of his high school diploma.  (<u>Id.</u> at 233-35.)

The second proceeding arose from the order to hire Abele and Mayer.  On May 12, 2009, C.A. and P.A. filed a motion seeking an order that Dracut comply with that decision.  (Supplemental Administrative Record ("SAR") at 1-14.)  The Hearing Officer held a hearing on June 19, 2009, and issued a second decision on July 14, 2009, finding that Dracut had failed to comply with his initial ruling by offering an unreasonably low rate of pay to Mayer and Abele ($32.15 per hour), and ordering Dracut to hire and compensate them at their private rates, $125.00 per hour. (<u>Id.</u> at 141, 144, 152.)  Dracut appeals both decisions.

### III.  <u>LEGAL STANDARD</u>

This action is essentially a request for judicial review of two administrative decisions.  <u>See Manchester-Essex Reg'l Sch. Dist. Sch. Comm. v. Bureau of Special Educ. Appeals</u>, 490 F. Supp. 2d 49, 51 (D. Mass. 2007).  The IDEA provides that the Court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).  No party has requested that the Court hear additional evidence regarding the claim that Dracut failed to provide adequate transition services.[6]

"Judicial review of the decision of the BSEA presents a two-fold inquiry: Whether the state has complied with the procedures of the Act, and whether the IEP developed through those procedures is 'reasonably calculated to enable the child to receive educational benefits.'"  Kathleen H. v. Mass. Dep't of Educ., 154 F.3d 8, 11 (1st Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982)).  The Court applies "an intermediate standard of review . . . which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review."  Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993); see also id. ("[T]he statute 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" (quoting Rowley, 458 U.S. at

---

[6] Plaintiffs moved to file a Second Amended Complaint, however, adding allegations that the Hearing Officer failed to disclose a conflict of interest because he is the former director of the Disability Law Center, which represents P.A. and C.A. (Docket No. 114.)  The Court had denied that motion.

206).)  Review is tempered by the "'due weight' [given] to the

Hearing Officer's findings."  Lt. T.B. ex rel. NB v. Warwick Sch.

Comm., 361 F.3d 80, 83 (1st Cir. 2004) (citing Roland M. v.

Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)).

In reviewing the evidence, "the burden rests with the

complaining party to prove that the agency's decision was wrong."

Roland M., 910 F.2d at 991.  After appropriate consideration, the

Court may accept or reject the agency's factual findings in whole

or in part.  Town of Burlington v. Mass. Dep't of Educ., 736 F.2d

773, 792 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985).

Conclusions of law are subject to de novo review, and any

determinations on mixed questions of fact and law, including the

sufficiency of an IEP, cannot stand if predicated on a legal

error.  Ross v. Framingham Sch. Comm., 44 F. Supp. 2d 104, 111-12

(D. Mass. 1999), aff'd, 229 F.3d 1133 (1st Cir. 2000).

Where, as here, state law requirements are also at issue, a

federal court's review is "asymmetrical" and "more circumspect."

Town of Burlington, 736 F.2d at 792.  A federal court should

accord the findings deference where a state administrative

decision rules that a school district has not met the state's

substantive or procedural requisites.  Id.

## IV.  DISCUSSION

### A.  Procedural Compliance

#### 1.  Proper Assessments

Dracut argues that the Hearing Officer erred when he concluded that Dracut failed to comply with the IDEA's procedural requirements by not conducting appropriate transition assessments.  He found that "Dracut did not conduct appropriate transition assessments . . . . [and] did not utilize Parents' transition assessments, which were appropriate."  (AR at 230.) Without adequate assessments, "it was not possible for Dracut to understand the nature and scope of Student's deficits as [they] . . . pertained to his transition from High School to postsecondary education, employment, and independent living."  (Id. at 221.) Consequently, he concluded that "Dracut's IEPs did not include any goals to effectively address Student's vocational needs and independent living skills deficits[,]" undermining the quality and relevance of the transition services provided.  (Id. at 222.)

The IDEA requires that Dracut provide "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and where appropriate, independent living skills." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa); see also 34 C.F.R. § 300.320(b)(1).  While the IEP itself must be "updated annually," 20 U.S.C. § 1414(d)(1)(A)(i)(VIII), there is no requirement that transition assessments be conducted annually, only that they be "age appropriate".  34 C.F.R. § 300.320(b)(1).

A procedural violation constitutes a denial of FAPE only if the hearing officer finds that the violation "(I) impeded the

-22-

child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process . . . ; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).  A procedural fault rises to this level when a school fails to conduct proper assessments and then provides inadequate services.  N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1210 (9th Cir. 2008) ("[W]ithout evaluative information that C.B. has autism spectrum disorder, it was not possible for the IEP team to develop a plan reasonably calculated to provide . . . meaningful educational benefit . . . .").

It is undisputed that Dracut did not conduct any assessments prior to the first two IEPs, though Dracut points out that it did employ a vocational assessment for the last IEP.  The state defendants argue that this assessment was faulty in multiple ways.  First, they argue that it was "stale," because it was completed in August 2007, six months before the implementation of the third IEP in February 2008.  There is no evidence that C.A.'s needs changed in the following six months or that the assessment was no longer age appropriate, so this argument is unpersuasive.

Second, defendants note that the Hearing Officer found this vocational assessment flawed because it "was insufficient even for the purpose of determining Student's vocational needs because it was only a formal (and not also a situational) assessment." (Id. at 221.)  The record flatly contradicts this finding, indicating that Mr. Brooks administered multiple tests over a

two-day evaluation period, _including_ a situational assessment.
The Hearing Officer does not explain why the tests or situational
assessment were inadequate.

The Court agrees that this assessment was untimely, however,
because it was not applied to C.A.'s services until the spring of
his senior year, only then at P.A.'s insistence, and nearly a
year after her initial request.  (See _id._ at 221 & n.34.)
Although Dracut ultimately offered C.A. a five-month long
internship at a credit union located in the high school, a four-
month technology internship, and a gym class mentoring program,
it passed most of the relevant two year window without action,
failing to assess or provide services to address C.A. vocational
skills, despite its obligation to do so throughout this period.

Third, the Hearing Officer found Mr. Brooks unpersuasive
because he did not have sufficient "depth or breadth of knowledge
and experience" in contrast to plaintiff's experts.  (AR at 230.)
However, because the expert was qualified, the Court disagrees
that the vocational assessment was so inadequate as to constitute
a procedural flaw per se.  The Hearing Officer indicated no
specific reason why Mr. Brooks, who holds a Masters in Education,
was unqualified to evaluate C.A.

Finally, the Hearing Officer faulted the assessment because
it did not address "other areas important to Student--that is,
post-secondary education and independent living skills."  (_Id._ at
221.)  The IDEA requires transition assessments "related to

-24-

training, education, employment and where appropriate,
independent living skills." 20 U.S.C. § 1414(d)(1)(A)(VIII)(aa).
As Dracut argues, the statute does not require separate
assessments in these four discrete silos.  While the vocational
assessment performed by Mr. Brooks certainly had relevance to
cross-cutting issues like social behavior, which affects
education, employment, and independent living, the evidence
supports the Hearing Officer's conclusion that the assessment and
resulting plan failed to provide measurable goals in these
separate areas.  This failure to provide proper assessments and
benchmarks for functional language pragmatics, which is relevant
to all four areas, is particularly egregious in light of Ms.
Abele's reports, which spoon-fed Dracut with the needed services.

2.    **Transition Goals**

The Hearing Officer found that Dracut's failure to provide an IEP containing appropriate transition goals denied C.A. a FAPE.  Dracut's final IEP addressed organizational deficits and disruptive behavior in class (e.g., recording assignments properly and learning relaxation techniques to control outbursts).  (AR at 1419-20.)  It argues that, because it facilitated C.A.'s ultimate goal of attending college, it met its obligation even if it failed to provide adequate benchmarks along the way.  Dracut's argument impermissibly conflates enabling C.A.'s broad vision statement (i.e., the long term goal of attending college and working with computers) with its statutory obligation to provide appropriate, <u>measurable</u> goals developed according to timely transition assessments.

In sum, Dracut operated without meaningful assessments for most of the two year period in question and never provided appropriate, measurable goals related to C.A.'s needs.  The Hearing Officer concluded that this "led directly to Dracut's failure to propose appropriate transition plans and services." (<u>Id.</u> at 221.)  As noted below, the record supports this conclusion, particularly regarding the failure to address C.A.'s pragmatic language deficits, which are key to his postsecondary academic, social, and vocational success.  Accordingly, the Court

concludes that the record supports the Hearing Officer's findings of a procedural violation of state and federal law.

**B.    Substantive Adequacy of the IEPs**

Dracut argues that the Hearing Officer erred in several respects with regard to the legal standard by which he evaluated the IEPs.  The governing standard for FAPE originated in Rowley, where the Supreme Court held that an "appropriate" education is one "reasonably calculated to enable the child to receive educational benefits."  458 U.S. at 207; see also Lenn, 998 F.2d at 1090 (noting that an IEP must be "reasonably calculated to provide effective results and demonstrable improvement in the various educational and personal skills identified as special needs.") (quotations omitted).  It is plain that, absent state law heightening the standard, a school need not provide an ideal education or deliver "the maximum educational benefit possible." Lessard, 518 F.3d at 23; see also N. Reading Sch. Comm. v. Bureau of Special Educ. Appeals, 480 F. Supp. 2d 479, 489-90 & n.12 (D. Mass. 2007).  Furthermore, a student's progress must be evaluated in light of his or her own unique educational potential.  Rowley, 458 U.S. at 202; Lessard, 518 F.3d at 29.  Beyond that, however, the standard is hardly a model of clarity.

Rowley held that an appropriate IEP must be reasonably calculated to provide "some educational benefit."  458 U.S. at 200.  Subsequent caselaw has referred to a "federal basic floor

of meaningful, beneficial educational opportunity." <u>Town of
Burlington</u>, 736 F.2d at 789; <u>see also</u> <u>Rowley</u>, 458 U.S. at 192
("[I]n seeking to provide . . . access to public education,
Congress did not impose upon the States any greater substantive
educational standard than would be necessary to make such access
meaningful."). The Third Circuit has adopted a "meaningful"
benefit test expressly. <u>See, e.g.</u>, <u>T.R. v. Kingwood Twp. Bd. of
Educ.</u>, 205 F.3d 572, 577 (3d Cir. 2000) (Alito, J.); <u>Cf.</u> <u>Sytsema
v. Acad. Sch. Dist. No. 20</u>, 538 F.3d 1306, 1313 n.7 (10th Cir.
2008) ("Admittedly, it is difficult to distinguish between the
requirements of the 'some benefit' and the 'meaningful benefit'
standards."); <u>Blake C. ex rel. Tina F. v. Dep't of Educ., State
of Haw.</u>, 593 F. Supp. 2d 1199, 1206 & n.7 (D. Haw. 2009) ("If
'some' means 'more than minimal' but real progress, then there
might be no difference."). In any case, it is settled law that a
parent may not dictate specific services, provided the IEP is
reasonably calculated to confer meaningful benefit. <u>Lachman v.
Ill. State Bd. of Educ.</u>, 852 F.2d 290, 297 (7th Cir. 1988).

While the Hearing Officer acknowledged this caselaw
explicitly (<u>see, e.g.</u>, AR at 215 n.8), Dracut argues that his
opinion effectively required a perfect solution when he adopted
hook-line-and-sinker the views of P.A.'s experts.

1.   **Pragmatic Language Skills**

The Hearing Officer determined that, while Dracut offered a
social skills class and counseling services, "these services . .
. were not the systematic, step-by-step instruction required to
address Student's underlying pragmatic language deficit." (Id.
at 224 n.39.)  Dracut points to no assessment that addressed this
need directly and offers no evidence that it provided meaningful
instruction in this area.  Dracut explained that it offered a
social skills class in the first IEP, but that he had improved to
the point that he did not require removal from the classroom to
address this issue.  The weight of the evidence does not support
this position, which relied upon anecdotal observations by Dracut
staff and was contradicted persuasively by the considerably more
detailed classroom observations by Ms. Abele.

The overwhelming evidence in the record indicates that
C.A.'s pragmatic language deficits are a central component of his
disability, affect his ability to transition from high school to
other settings in a critical way, and were well known to Dracut
as early as 2005, well before the IEPs in question.  The Court
observed this deficit when C.A. blurted out an inappropriate
statement in court.  A preponderance of the evidence demonstrates
that Dracut's IEPs were not reasonably calculated to confer any
meaningful educational benefit in this critical area.

2.   **Vocational Skills**

The Hearing Officer found that Dracut failed to provide training "reasonably calculated to enable Student to develop vocation skills . . . after High School." (Id. at 231.)   In his view, the services were inadequate because they did not expose C.A. to the "full range of situations involving interaction with the public and peers, with the result that Student did not experience all of the communication and social skills typically found with a job in the community." (Id. at 227.)   The Hearing Officer found specifically that while "Dracut's work internships undoubtedly assisted Student by providing him with employment-like experiences, there is no basis for concluding that the skills that he learned . . . are transferable to . . . actual work sites in the community." (AR at 227 (emphasis added).)   "To provide minimally useful transition services regarding employment," he found, Dracut should provide community-based internships.   He found support for this conclusion in the testimony of plaintiffs' experts, Ms. Mayer and Ms. Hart.   (Id.; see also Pl.'s Statement of Facts ¶¶ 48-49.)

Dracut argues that the Hearing Officer erred when he found that it provided no meaningful vocational services.   As the First Circuit held, the lack of extensive community-based services does not necessarily render a transition plan inappropriate where an IEP encapsulates "a wide array of other transition services." Lessard, 518 F.3d at 30 (finding field trips into community

sufficient in context of myriad other services).  Otherwise,
parents could "endlessly parse IEPs into highly particularized
components and circumvent the general rule that parents cannot
unilaterally dictate the contents of their child's IEP."  Id.
(citing Rowley, 458 U.S. at 207-08).

The placements may not have been the ideal internships in
the eyes of C.A.'s experts because they were not in the
community, but the evidence indicates that they provided some
benefit.  (See, e.g., AR at 213 (noting that he "flourished" in
the role of a gym mentor).)  While these services might otherwise
have been sufficient, the individual defendants are correct that
there were no placements or experiences in the community, and the
statute refers to "community experiences" specifically.  20
U.S.C. § 1401(34)(C).  Indeed, Lessard made a point of noting
that the student there had received at least one placement in the
community, however inefficacious in practice.  518 F.3d at 30.
While C.A. had an internship in the school credit union, it was
not located off of school grounds.  As such, it was not erroneous
for the Hearing Officer to conclude that Dracut's vocational
services were inadequate.  (See AR at 226-27.)

### 3.  **Independent Living Skills**

The Hearing Officer also determined that Dracut had not made
sufficient effort to address independent living skills, and
criticized Dracut for failing to address C.A.'s social,
organizational, and travel skills.  Dracut points out that it

offered a social skills class, and his track team experience
provided further help.  The IEPs also offered direct services
delivered by a special education teacher to address the student's
organizational deficits.  (AR at 226.)  The Hearing Officer
acknowledged that he received meaningful academic benefit from
this support, but reasonably determined that the services were
not reasonably calculated to supporting independent living
outside of high school, such as maintaining self-hygiene and
learning transportation skills.  (<u>Id.</u>)  Indeed, C.A.'s action
plan for daily skills addresses <u>only</u> his independence in the
school environment.

C.   **Appropriate Relief**

     1.   **Compensatory Education**

     Having found that C.A. did not receive a FAPE, the Hearing
Officer ordered Dracut to provide two additional years of
transition services with the following parameters:

>    *    Systematic, step-by-step pragmatic language
>         instruction taught with consistency over a period
>         of time . . . with the addition of a significant
>         amount of practice with a language pragmatics
>         teacher within a variety of contexts, including
>         higher education and employment.
>
>    *    Development of organizational skills that can be
>         utilized within a variety of settings, including
>         postsecondary education, employment, and
>         independent living (including, for example,
>         personal hygiene).
>
>    *    Vocational training that includes placement and
>         support within three or four work sites in the
>         community, with each work site lasting for three
>         or four months.  Work placements may be part-time,

so that Student may continue to pursue part-time
postsecondary education and receive other
transition services at the same time.

* Travel instruction for the purpose of Student's
learning to use the public transportation system
and to understand the Massachusetts driver's
manual.

* A comprehensive social skills assessment (part of
which would include interviews of others who have
encountered Student) by someone with substantial
experience and expertise working with older
students diagnosed with Asperger's Syndrome, and
social skills training to be developed and
provided on the basis of this assessment.[7]

(AR at 235.)  The Hearing Officer reasoned that the scope of the

services required and the need to continue adapting them to

C.A.'s evolving needs "argues in favor of continued [IDEA]

eligibility in order that the various substantive and procedural

requirements relevant to transition services will continue to

apply to Student."  (Id. at 233.)  Since he concluded that he

"may extend Student's eligibility for two years for the purpose

of receiving appropriate and sufficient compensatory services,"

the Hearing Officer ordered that "Dracut may (and should) grant

Student his high school diploma at this time."  (Id. at 234.)

Finally, he ordered Dracut to hire Ms. Abele and Ms. Mayer or

their designees, in order to

(1) provide consultation to Dracut to assist in the
development of the transition plan that complies with
the instant Decision, (2) advise Dracut during the two-

---

[7] The Hearing Officer noted that, while another public
entity, like the Massachusetts Rehabilitation Commission, might
provide some services, Dracut ultimately would be responsible for
ensuring that C.A. received them.  (Id. at 235 n.59.)

year period of extended eligibility regarding the need for any modifications to Dracut's proposed transition plan, and (3) advise Dracut regarding the appropriate implementation of its transition plan.

(Id. at 236.)

Dracut argues that the Hearing Officer's decision to grant C.A. his high school diploma terminated his eligibility for services under the IDEA.  Dracut is correct that under both federal and state law, a disabled student who has graduated with a "regular" high school diploma is no longer eligible for services.  34 C.F.R. § 300.102(a)(3)(i) (stating that the obligation to provide FAPE does not apply to "[c]hildren with disabilities who have graduated from high school with a regular high school diploma."); 603 Mass. Code Regs. 28.02(9) ("Eligible student shall mean a person aged three through 21 who has not attained a high school diploma or its equivalent . . . .").

Defendants argue that the Hearing Officer has the equitable power to extend eligibility as a compensatory measure even after graduation from high school.  The parties cite no caselaw authorizing such relief, and the Court can find none.  The Hearing Officer's discretion in fashioning a compensatory remedy does not permit him to ignore the clear regulatory language.

As a fallback, the state defendants argue that a Hearing Officer has broad equitable discretion in fashioning and awarding compensatory education to remedy a FAPE denial, even if a student has become ineligible for services because of the issuance of a

diploma.  In a similar context, the First Circuit held that, as a matter of common sense, compensatory education is appropriate for a student deprived of services to which he was entitled under the IDEA, regardless of his eligibility for current or future services under the statute.  Otherwise, a school could simply cease providing services to an older student, counting on the IDEA's lengthy adjudication procedures to "time out" the student's eligibility and obviating the need for any further obligation by the school.  Pihl, 9 F.3d at 189; see also Stock v. Mass. Hosp. Sch., 392 Mass. 205, 210 n.8, 467 N.E.2d 448, 453 n.8 (1984) (noting expulsion as a similar potential loophole).

Compensatory education is an equitable remedy fashioned to fit an individual student's needs.  C.G. v. Five Town Community Sch. Dist., 513 F.3d 279, 290 (1st Cir. 2008).  Such services are a surrogate for the education that a student should have received "during periods when his IEP was so inappropriate that he was effectually denied a FAPE."  Reid v. District of Columbia, 401 F.3d 516, 525 (D.C. Cir. 2005).  A school must provide compensatory services "equal in time and scope" with what a student would have received while eligible.  Puffer v. Raynolds, 761 F. Supp. 838, 853 (D. Mass. 1988).

Dracut argues that this caselaw is distinguishable because the Hearing Officer himself determined that it should award C.A. his diploma, unlike the more typical situation where the issuance of the diploma was flawed because the school district issued a

diploma prematurely before a disabled student could receive a FAPE. Dracut's argument is unpersuasive. Here the issuance of the diploma was improper because C.A. was denied a FAPE. If the Hearing Officer had wanted to continue eligibility, he should have continued the "stay put" order, issued pursuant to 20 U.S.C. § 1415(j), which would have prohibited Dracut from giving C.A. his diploma.[8] Now that Dracut has issued the diploma, the proper remedy is compensatory services.

Dracut contends that the "compensatory services" are excessive because they are not limited in time and scope and require an ideal, potential-maximizing solution rather than simply compensating C.A. for those services to which he was entitled under Rowley. Because the Hearing Officer determined that he could extend eligibility, the record is unclear as to the standard he applied in ordering this compensatory relief. For example, he ordered three to four four-month internships in the community over two years. When deferring to the pedagogical expertise of the Hearing Officer, the Court agrees with all the experts that some community vocational experience is appropriate. However, the Hearing Officer seemed to ignore the significant vocational services already provided in fashioning a compensatory remedy. The Hearing Officer must provide a surrogate for what

---

[8] The P.A. and C.A. urge remand so they can challenge the issuance of the diploma. Dracut contends that C.A. waived his right to do so by failing to appeal that order and opposes the request for a remand to make such a challenge. The Court agrees that any challenge now would be untimely.

services should have been provided to comply with <u>Rowley's</u> "some benefit" standard rather than adopting an ideal menu of programs desired by parents or recommended as optimal by their private experts.

Moreover, while the Hearing Officer acknowledged that Dracut had made some efforts with its transition services to develop C.A.'s organizational and social skills, he appears to have accorded that benefit little weight in determining what compensatory services were appropriate in the area of services to enhance independent living skills.  Because the Hearing Officer extended eligibility improperly and did not seem to follow the correct federal standard in awarding compensatory services, I must remand to the Hearing Officer to determine what compensatory services are needed in the area of employment and independent living.  He also made a passing reference to the requirement of two years of services for older students under Massachusetts special education requirements.  (AR at 235.)  However, he did not explain how services might be justified under state law rather than federal law.  I do not remand, however, with respect to the order requiring pragmatic language instruction which the Hearing Officer properly found was not provided at all.

### 2.   <u>Hiring and Compensating C.A. and P.A.'s Experts</u>

Dracut disputes the Hearing Officer's orders that it hire and compensate Ms. Mayer and Ms. Abele for two years of "consultation" at their private rates of pay in order to

formulate the new transition plan, arguing that state law vests exclusive authority over hiring and compensation with school superintendents. See Mass. Gen. Laws ch. 71, § 59B.  In the second administrative decision at issue here, the Hearing Officer ruled on Dracut's attempt to pay these experts $32.15 per hour, a rate it claimed was mandated by the Massachusetts Division of Health Care Finance and Policy regulations, 114.3 Mass. Code Regs. 30.04.[9]  The Hearing Officer held that the state law cited by Dracut did not support Dracut's position, and noted that Dracut acknowledged that it had never used this rate before. (Id. at 148.)  In his view, his equitable discretion in fashioning an appropriate compensatory remedy justified paying Ms. Abele and Ms. Mayer at $125 per hour, their private rates for school consultation.

Some courts have ordered schools to hire independent consultants to remedy deficiencies.  See, e.g., Elizabeth M., 2003 WL 25514791 at *5; Bell v. Bd. of Educ. of Albuquerque Pub. Schs., No. 06-1137, 2008 WL 5991062, at *35 (D.N.M. Nov. 28, 2008).  Defendants cite only one unpublished case where a school district was ordered to employ another party's experts to aid in developing a new IEP.  See Alba-Golden Indep. Sch. Dist., 45

---

[9] This provision sets forth an extensive schedule of allowable fees for "[s]pecific services performed as part of a TEAM evaluation," as described within the special education statute.  114.3 Mass. Code Regs. 30.04.  The specific provision in question allows a fee of $32.15 for "[p]articipation in TEAM Meeting by authorized social worker, nurse, or counselor."  Id.

IDELR 291, slip op. at 6 (Aug. 19, 2005).  Because Dracut has not shown that it has employees with the necessary skills to provide compensatory services, regardless of state law,[10] the Hearing Officer had the equitable power to order that the district hire an independent consultant with appropriate credentials at a reasonable rate of pay, particularly with respect to a compensatory award.  The Court concludes, however, that it was an abuse of discretion to require Dracut to hire defendants' experts in this case even though they seem to be highly qualified.  The IDEA requires the school district to work as a team with parents' experts, but the IDEA does not require a school district to hire them.  Cf. Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 298-99 (2006) (holding that IDEA does not permit courts to award expert services fees to prevailing parents).

Thus, the Court reverses the order to the extent it requires Dracut to hire defendants' consultants or their designees.[11] However, it does _not_ reverse the order to the extent it requires the school district to hire independent consultants with sufficient expertise at a _reasonable_ rate of pay.  The Hearing Officer concluded properly that state law does not require Dracut to provide outside consultants who provide services other than

---

[10] The Court does not address the Hearing Officer's interpretation of the state regulations at issue, which seemed reasonable.

[11] Of course, these experts should be compensated fairly for any services already provided pursuant to the Hearing Officer's order.

-39-

assessments with compensation at $32.15 an hour.  Dracut offers
no argument and the record yields no facts undermining his
conclusion that $125 per hour is a reasonable rate.

### ORDER

Plaintiff's Motion for Summary Judgment [Docket No. 83] is
**ALLOWED IN PART**, and the individual defendants' Motion for
Summary Judgment [Docket No. 77] is **ALLOWED IN PART**.  The motions
are otherwise **DENIED**.  The order requiring Dracut to hire
plaintiffs' experts is reversed.  The Hearing Officer's order
extending statutory eligibility is reversed, and the case is
remanded for further proceedings consistent with this opinion.

/s/ Patti B. Saris

_____
PATTI B. SARIS
United States District Judge